25 Cal.App.4th 580 (1994)
30 Cal. Rptr. 575
In re RICHARD K. et al., Persons Coming Under the Juvenile Court Law.
TULARE COUNTY DEPARTMENT OF PUBLIC SOCIAL SERVICES, Plaintiff and Respondent,
v.
BRENDA K., Defendant and Appellant.
Docket No. F020483.
Court of Appeals of California, Fifth District.
June 1, 1994.
*582 COUNSEL
Gregory M. Chappel, under appointment by the Court of Appeal, for Defendant and Appellant.
Lita O'Neil Blatner, County Counsel, Teresa M. Saucedo and Roger Coffman, Deputy County Counsel, for Plaintiff and Respondent.
[Opinion certified for partial publication.[*]]
OPINION
MARTIN, Acting P.J.
Brenda K. appeals from juvenile court dispositional orders adjudging her minor children dependents and removing them from her custody. The mother's alcohol abuse and emotional problems are at the root of these proceedings. On appeal, she contends her problems have not adversely affected her children and therefore the juvenile court's findings and orders are unjustified. We will affirm.
On March 11, 1993, Tulare County Child Protective Services (CPS) detained 17-year-old Richard K.[1] and his 14-year-old sister Melissa K. In turn, the county's department of public social services (Department) petitioned the juvenile court to declare the two teenagers dependent children pursuant to Welfare and Institutions Code[2] section 300, subdivisions (b) (failure to protect), (c) (serious emotional damage), and (i) (cruelty).[3] Immediately prior to this intervention, both children were living with their mother; their father lived in Louisiana and never participated in these proceedings.
The mother did not appear at a jurisdiction hearing set for early April 1993. Consequently, the court took the mother's default and sustained the petition on all three grounds as to Richard and on section 300, subdivision (b) grounds as to Melissa. The court adjudged the children dependents and ordered reunification services.
In July of 1993, the mother moved for relief from her default. Following a hearing on the matter, the court granted the mother's motion and set the matter for a new adjudication hearing in mid-August.
The juvenile court conducted the new jurisdictional hearing over four days in August 1993. The Department submitted the matter on its preadjudication *583 social study, filed the previous March, which the court in turn admitted into evidence. The mother cross-examined the author of the report and offered testimony by her then-estranged husband who was the children's stepfather and by her daughter Melissa.
At the conclusion of the jurisdictional hearing, the juvenile court determined, under section 300, subdivision (b), the two minors had suffered, or there was a substantial risk they would suffer, serious physical harm or illness by the willful or negligent failure of the mother to provide them with adequate food, clothing, shelter, or medical treatment or by her inability to provide regular care for the children due to her substance abuse. Specifically, the court found: "Minors' mother abuses alcohol ... and suffers from emotional problems. [ ] Such abuse and problems periodically render her unable to properly care for the minors. Such inability includes but is not limited to on or about March 2nd, 1993, and on prior occasions, minors' mother and stepfather, Joe [R.] engaged in violent verbal confrontations in the presence of the minors. Minor Ricky has special needs and said alcohol abuse, emotional problems, and confrontations exacerbate the minor Ricky's problems." The court dismissed the balance of the amended petition and set the matter for disposition in late September.
In preparation for the dispositional hearing, the Department filed its report, recommending out-of-home placement for both children and extensive reunification services for them as well as their mother. The parties submitted the matter on the recommendation. The court adjudged the children dependents, placed them in the Department's custody and ordered the services recommended by the Department.
The mother filed a timely notice of appeal.

FACTS

Prior History
Ricky has been a client of the Central Valley Regional Center[4] (CVRC) since 1976, the year in which he was born. He lived with his mother until he was five at which time he was placed in a state-licensed community care facility for reasons undisclosed on this record. He remained in community care until 1989 when his mother took him home to live with her. However, *584 the family came to the attention of CPS in 1986 when the mother suddenly threatened to take Ricky to Washington State with her. It was discovered the mother suffered from a panic disorder and abused alcohol. Ricky was briefly detained; however, a dependency petition was dismissed in early 1987.
During his eight-year period of community care, Ricky sometimes exhibited difficult behaviors but never required psychotropic drugs. He could be managed with structure, consistency, and some basic behavior modification techniques. Following Ricky's return home, however, the mother sought medications to control his behavior.
Between 1989 and February 1993 there were a total of nine CPS referrals in connection with this family.[5] As set forth below, most were related to allegations of the mother's alcohol abuse. Many of these referrals resulted in the offering of services. However, until the fall of 1992, CPS stopped short, in each instance, of initiating dependency proceedings.
In 1989 and 1990 CPS received three referrals concerning the mother's drinking which raised questions about her ability to care for her children. Each of these cases was closed once it appeared the mother was capable of appropriate parenting. In August 1990, CPS received a referral after the mother had not returned home as scheduled from a trip to Las Vegas. The children's care provider had tired of caring for them. The children's aunt, however, took over for the caretaker.
Next, in February 1991, CPS received a referral that the mother had admitted she was an alcoholic and needed help. Home respite care was arranged through CVRC for Ricky and Melissa who stayed with the family's landlord. The mother was referred to several programs and warned if she did not take care of her drinking problem, juvenile court action could be taken.
In April 1992, CPS received yet another referral regarding the mother's alcoholism. Though the mother then denied a drinking problem, she did admit she had recently gone to jail for being drunk in public. While the referral included a report that the mother was verbally abusive to 13-year-old Melissa, both mother and daughter denied the charge. It appeared to the social worker that Melissa had assumed the role of mother in the family. The mother left her to care for Ricky at times although Melissa claimed she always knew how to reach her mother if necessary. CPS again closed the case.
*585 The following month CPS received a referral that the "mother was bipolar and appeared to be in the manic phase." Not only did she appear drunk, she apparently believed someone was going to shoot her. A social worker substantiated the referral. Shortly thereafter, the mother called CVRC to request someone come and pick up the children. She sounded paranoid and delusional at the time. The case was closed after Ricky was placed in respite care.
There was another referral in August 1992 when the mother went on vacation and left Melissa to take care of Ricky who was then on medication. A young adult neighbor, however, was watching the children at night.
Then, in late October 1992, CPS received yet another referral that the mother was drinking heavily and had struck Melissa and accused her of having sexual relationships. Melissa apparently wanted to be removed from the house at the time. It also appeared the mother had been locking Ricky in his room because he was hyperactive.
The children were detained and dependency proceedings initiated. For approximately the next three months, the children were in foster care. During that time period, Ricky was gradually weaned from the medications his mother had insisted he needed for her to control him. His behavior in foster care was described as stable and quite manageable. Melissa apparently did well in foster care too. In late January 1993, however, the juvenile court dismissed the petition.

Events Leading to Instant Petition
On March 2,[6] CPS received the following referral: "R.P. [reporting party] was called to this home due to violence of the mother. Whole house was trashed. Mom said that her ex-husband had done it. When the police arrived at the home  at the house, the mom met them at the door with a gun in her hand. R.P. took Mom to Tulare District Hospital and had drug test done. Came back positive for cocaine and amphetamines. R.P. said that the mother has gone back home and her new husband is also there. His name is Joe [R.] They have been married for one month only."
According to Melissa, her mother and stepfather had been arguing during the two days preceding March 2. Sometime that afternoon, Brenda appeared nervous and worried that Joe R. would come home from work,[7] retrieve *586 some guns which he kept in the house, and harm her.[8] The mother who was very afraid of guns did not know where her husband kept his firearms. However, Joe had told Melissa where the guns were. Knowing this, Brenda instructed Melissa to "get the guns." The mother then purportedly called the police in order to turn the guns over to them. It was for this reason Brenda met the officers at the door with a handgun.[9]
The police had been called to the family home between five and ten times since January 1993. Melissa called the police on some of these occasions when her mother and stepfather fought.
Later on March 2, there was another referral. The mother called police for an ambulance because Ricky had cut his finger and needed medical attention.[10] When the ambulance arrived, Ricky was distraught and had to be wrestled to the ground. According to Melissa, Ricky was already upset because Brenda and Joe had been fighting. Then, when he saw the police, Ricky became more upset and tried to run away.
When the social worker interviewed Melissa on March 3, the teenager was very defensive of her mother and maintained everything was fine at home.
On March 5, 1993, Tulare police found Ricky wandering around downtown Tulare at 10:30 p.m. He had snuck out a window and left home. Ricky was extremely violent and his mother requested he be taken to the Renaissance Center, an adolescent facility at Clovis Community Hospital, because she was unable to control him. Ricky was admitted to the hospital facility as gravely disabled and a danger to others.
Ricky reported his mother and stepfather had been fighting all day[11] and his mother had threatened to hit him with a belt. In response, Ricky became upset, began to hit his mother and later left home. When Brenda later described the events of March 5 to the social worker, she reported Ricky had been hitting Melissa and her. Then, the mother allegedly had to restrain him.
According to Dr. Fox, the boy's psychiatrist, Ricky's emotional well-being and his behavior had begun to deteriorate following his return to his *587 mother's care in January. The doctor reported Ricky now was explosive and physically assaultive around issues dealing with his mother. Ricky had clearly stated to the Renaissance staff that he did not want to return home. If he did, they would just fight. He was afraid of both adults. Ricky also feared his stepfather would shoot him.
Based on this incident and the lengthy history of Brenda's inability to care for Ricky, Dr. Fox recommended Ricky's detention and placement in an appropriate CVRC home. He was placed with the same foster family who cared for him in late 1992 and early 1993. The foster mother later informed the social worker that when they arrived to pick up Ricky from the hospital, he ran and jumped into her husband's arms and wrapped his legs around him. On the way to the foster parents' home, Ricky "continued to mention that his mother was `drunk, drunk, drunk,' and that she still locked him in his room and tied him up. He stated that he did not like his mother when she drank."

DISCUSSION

I. Substantial Evidence to Support Juvenile Court's Exercise of Jurisdiction[*]
.... .... .... .... .... .... .... .

II. Removal Order

(1a) The mother next contends there was insufficient evidence to support the dispositional order removing the children from her custody. However, as discussed below, it appears from the record she has waived any objection to the juvenile court's dispositional orders. Thus, she may not be heard to claim insufficient proof.
In her dispositional report, the social worker proposed numerous findings and orders for the juvenile court to make. In relevant part, she recommended the court order Ricky and Melissa removed from the mother's physical custody based on a section 361, subdivision (b)(1) finding of a substantial danger to their physical health.
At the dispositional hearing, the court called the case and had the following discussion with counsel for the mother:
"THE COURT: ... On the [K.] matter, counsel are present with their clients. And we're here for disposition today. Are you ready?
*588 "MR. HAMILTON [counsel for the mother]: We're prepared, your Honor.
"THE COURT: Okay. And how did you want to proceed?
"MR. HAMILTON: I just had a  one second here, and I think we'll submit it.
"THE COURT: All right.
"MR. HAMILTON: Your Honor, Number 12, a psychologist can't prescribe drugs.
"THE COURT: I'll take care of that. What else? We're here for disposition. Are you submitting on the recommendation?
"MR. HAMILTON: Yes. Yes, we are. A couple things that we want on the record at some point."[12] (Italics added.)
The court in turn adjudged Ricky and Melissa dependents, took custody from the mother and committed the children to the Department's custody for suitable placement.[13] Counsel for the mother did not attempt to introduce evidence at this hearing or offer any argument.
In common usage, the word "submit" has several definitions. (Webster's Third New Internat. Dict. (1986) p. 2277.) Among those are applications particularly relevant to judicial proceedings, i.e.: (a) to send or commit for consideration, study or decision; and (b) to present or make available for use or study. (Ibid.) For instance, after the parties present evidence and argue their respective positions, they will "submit" the matter, asking the court to rule without further argument. (People v. Terry (1970) 2 Cal.3d 362, 378 [85 Cal. Rptr. 409, 466 P.2d 961].) Litigants also "submit" or present evidence to the court. In dependency cases, for example, we find numerous references to a social worker's submitting a report and recommendations to a court. (In re Corienna G. (1989) 213 Cal. App.3d 73, 76 [261 Cal. Rptr. 462]; see also Cal. Rules of Court, rule 1455(a).)
(2) However, the primary definition of submit is to yield to, to surrender or to acquiesce. (Webster's Third New Internat. Dict., supra, p. 2277.) In this regard, it is not uncommon in dependency proceedings for a parent to "submit" on a social services report. (See, e.g., In re Tommy E. (1992) 7 *589 Cal. App.4th 1234, 1236-1237 [9 Cal. Rptr.2d 402]; Cal. Rules of Court, rule 1449(e).[14]) By submitting on a particular report or record, the parent agrees to the court's consideration of such information as the only evidence in the matter. Under such circumstances, the court will not consider any other evidence in deciding whether the allegations are true. (In re Tommy E., supra, 7 Cal. App.4th at p. 1238.)
Notwithstanding a submittal on a particular record, the court must nevertheless weigh evidence, make appropriate evidentiary findings and apply relevant law to determine whether the case has been proved. (In re Tommy E., supra, 7 Cal. App.4th at p. 1237.) In other words, the parent acquiesces as to the state of the evidence yet preserves the right to challenge it as insufficient to support a particular legal conclusion. (Id. at p. 1237.) Thus, the parent does not waive for appellate purposes his or her right to challenge the propriety of the court's orders.
(1b) In the present case, the mother's submittal amounted to acquiescence. Obviously, she was not the party presenting the social worker's recommendation to the court nor did she offer evidence and argue her position, in essence, asking the court to rule without further argument. However, the mother submitted on the recommendation, not on the report. We have found no authority which analyzes the legal consequence of a parent's submittal on a social worker's recommendation.
Nevertheless, the mother's submittal on the recommendation appears to distinguish this case from Tommy E. In our view, the mother's "submitting on the recommendation" constituted acquiescence in or yielding to the social worker's recommended findings and orders, as distinguished from mere submission on the report itself. This is considerably more than permitting the court to decide an issue on a limited and uncontested record, as was the case in Tommy E. The mother's submittal on the recommendation dispels any challenge to and, in essence, endorses the court's issuance of the recommended findings and orders.[15]
In other words, the mother was not disputing that the court should adjudge her children dependents, order them removed from her custody and provide a reunification plan. If, as occurred in this case, the court in turn makes the *590 recommended orders, the party who submits on the recommendation should not be heard to complain. (3) As a general rule, a party is precluded from urging on appeal any point not raised in the trial court. Any other rule would permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware. (In re Riva M. (1991) 235 Cal. App.3d 403, 411-412 [286 Cal. Rptr. 592].) (1c) Similarly, in this case, by submitting on the recommendation without introducing any evidence or offering any argument, the parent waived her right to contest the juvenile court's disposition since it coincided with the social worker's recommendation. He who consents to an act is not wronged by it. (Grunsky v. Field (1905) 1 Cal. App. 623, 626 [82 P. 979].)

III. Facts to Support a Reasonable Efforts Finding[*]
.... .... .... .... .... .... .... .

DISPOSITION
The judgment is affirmed.
Vartabedian, J., and Harris, J., concurred.
NOTES
[*] Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts I and III.
[1] Richard K., also known as Ricky, has Down's syndrome.
[2] All statutory references are to the Welfare and Institutions Code.
[3] After filing an original petition on March 15, the Department filed an amended petition on March 30.
[4] Regional centers provide services for developmentally disabled persons to enable them to approximate the pattern of everyday living of nondisabled persons of the same age and to lead more independent and productive lives in the community. (Association for Retarded Citizens v. Dept. of Developmental Services (1985) 38 Cal.3d 384, 388 [211 Cal. Rptr. 758, 696 P.2d 150].)
[5] The mother contends in her reply brief that the court excluded evidence of her prior involvement with CPS. She is incorrect. The court deleted only one paragraph of the social worker's report, a paragraph pertaining to a January 1993 dismissal.
[6] Incidentally, this was Ricky's 17th birthday.
[7] Joe R. was a grade school teacher.
[8] There was no evidence that Joe R. had ever threatened Brenda with a gun. Nor was there any evidence of physical violence between the two before this time. Both Melissa and Joe R. expressly denied any such conduct.
[9] Melissa gave a different version of the March 2 events when she spoke with the social worker on the 3d. She claimed the incident was due to her stepfather "`wigging out.'" He "had gotten all his guns out and that her mother was just trying to get them away from him." When the police arrived, Joe R. had calmed down but her mother had not. She was so irrational the police would not even speak to her. Joe R. denied retrieving any guns or threatening anyone.
[10] It appears from the police report that Ricky had intentionally injured himself.
[11] Joe R. denied being home on the night Ricky ran away.
[12] As the reporter's transcript later reveals the "things" to which counsel referred related to certain terms in the reunification plan.
[13] In part I of this opinion we affirmed the lower court's removal order as to both minors.
[14] California Rules of Court, rule 1449(e) provides: "[At the jurisdictional hearing] [t]he parents or guardian may elect to admit the allegations of the petition, plead no contest, or submit the jurisdictional determination to the court based on the information provided to the court, and waive further jurisdictional hearing."
[15] In response to county counsel's argument of waiver, the mother does not argue her counsel misspoke or she did not intend to submit on the recommendation. Rather, she claims there is no merit to the argument because no pertinent authority is cited.
[*] See footnote, ante, page 580.