Filed 12/20/13  In re S.L. CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re S.L. et al., Persons Coming Under the Juvenile Court Law. | |
| CONTRA COSTA COUNTY CHILDREN & FAMILY SERVICES BUREAU,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>M.P.,<br><br>        Defendant and Appellant. | A137850<br><br>(Contra Costa County<br>Super. Ct. Nos. J12-01262, J12-01263, J12-01264) |

M.P. (Mother) appeals jurisdictional and dispositional orders as to three of her children, S.L., W.S., and N.S. (Minors).[1]  We conclude the jurisdictional orders are supported by substantial evidence, and that Mother's challenge to the dispositional orders is moot.

## I.  BACKGROUND

The Contra Costa County Children & Family Services Bureau (the Department) filed petitions pursuant to Welfare and Institutions Code[2] section 300 as to then two-year-old S.L. and one-year-old twins W.S. and N.S. on September 5, 2012.

---

[1] Minors' respective fathers are not parties to this appeal.

[2] All statutory references are to the Welfare and Institutions Code.

1

## A. Detention and Jurisdiction

According to the detention/jurisdiction report, Mother was homeless, and Minors were being cared for by their maternal grandparents (Grandmother and Grandfather). Grandmother told a social worker she was already the guardian of Mother's two oldest children, had a temporary guardianship of S.L., and was seeking non-temporary guardianship of S.L. S.L. had been living with Grandmother for about a year. Mother left her one-year-old twins, W.S. and N.S., with Grandmother a few days previously, saying she would pick them up the following day. As of August 27, Mother had not yet done so, and had not called to tell Grandmother when she would return. Mother did not leave clothing, shoes, or diapers for the twins. Mother had left her children and failed to return in the past, and Grandmother was worried about the twins because Mother was unpredictable, had lost her apartment, and had been living with strangers. Mother did not leave a working phone number, and Grandmother did not know where she was living. Mother would call or text Grandmother from blocked numbers.

Grandmother told the social worker that on at least three occasions, she or Grandfather had to search for Mother so they could get her to sign a form allowing S.L. to see a doctor or to be enrolled at preschool. Grandmother was not willing to have Mother live in her home; she said she had done so in the past, and " 'it ends up with us fighting and I am not going to fight with her anymore and bring all of that mess in my house.' " Grandmother said she was willing to care for Minors under the direction of the Department or a probate guardianship, but " '[w]e just can't have her pulling the kids out of the home and then dropping them off.' "

Grandmother told the social worker on August 28, 2012 that Mother had called that morning and told her that she and another young woman were in a parked car, hiding from a man who was trying to find them and harm them. Before the call, Mother sent Grandmother a text saying she was tired and just wanted to sleep. The social worker called Mother at the number of the phone she had been using, and Mother said she was safe.

Later that day, at the social worker's request, Mother met the social worker. Mother said her life was " 'out of control' " and that she needed "a 'break' from everything." She said her car had been stolen, she had no place to live, she had no clothes for herself or her children, and she was " 'tired.' " Mother told the social worker she was unwilling to go into a shelter. She told the social worker she received $2,000 a month in aid, but could not explain why she was homeless. She did not answer when the social worker asked why she had not picked up her children or called Grandmother and Grandfather. When asked why she had left the children without any provision, she began to cry and said she " just needed to figure things out." When asked about the incident in which she was hiding in a car, Mother said she was with a friend who was hiding from her boyfriend, and that the boyfriend had a gun. She told the social worker she would be staying the night with a friend called "Rey Rey" and would be safe.

Mother agreed to return to the Department's office on August 30, 2012, for a family meeting with the social worker and the grandparents. She failed to attend the meeting, and did not call to tell the social worker she would not be there or to reschedule the meeting.

Grandmother told the social worker she had spoken with Mother after the worker met with Mother, and that Mother said the friend called "Rey Rey" did not exist. Mother told Grandmother she had nowhere to go, and that she was going to "hang out" with the friend who had been chased by her boyfriend. Grandmother told Mother to stay with her biological father; the next day, the biological father told Grandmother that Mother left his home while he was sleeping and did not provide her whereabouts. Grandmother reported that Mother was a heavy drinker.

On August 31, Mother left a phone message telling the social worker she missed the meeting because she was confused about the date, and she left a contact number. The social worker left a message with the person who answered that number, and left a second message at another contact number. Another possible number was disconnected.

On September 2, 2012, Mother called Grandmother and said she would like to pick up her children. Grandmother advised Mother to talk with the social worker. Two

3

days later, Grandmother gave the social worker another contact number for Mother. The social worker called that number and left a message.

Mother called the social worker on September 5, 2012, and the social worker told her the Department had filed a petition on behalf of Minors. Mother told the social worker she had somewhere to stay, and a friend said Mother was staying with her.

At the October 11, 2012 jurisdiction hearing, Mother testified that S.L. had been in Grandmother's care from approximately May until July, and that Grandmother had sought legal guardianship of S.L. so that she could enroll her in preschool. Mother was opposed to the plan because she wanted her three younger children to be in child care together. Mother gave Grandmother half her food stamps and $300 or $400 each month for clothes and diapers. She said the twins were up-to-date on their medical care.

Mother testified that before the broken August 30 appointment, the social worker told her to leave the twins with Grandmother for the rest of the week. She told the social worker she was "really stressed out." She had been living with a friend, L.A., for two months, and had food and clothes for her children in the apartment. When asked about the incident in which another friend's boyfriend was pursuing them with a gun, she said nothing like that had ever happened before, and she had not seen the friend since that incident.

Mother testified she dropped the twins off at Grandmother's house on August 22, 2012 because she was getting "stressed out" with them and had nowhere else to take them. When asked why she had not picked up the twins from Grandmother's house, Mother said she had not forgotten them, but she was "stuck in Richmond with [her] friend," and that she kept calling Grandmother to tell her she was coming to get the twins.

Mother was pregnant at the time of the jurisdiction hearing, and had recently been hospitalized for two weeks due to chronic hypertension. Mother had a stroke two years previously, and was at high risk of another stroke or a heart attack. She said the friend she was living with, L.A., would care for the twins if Mother had another medical emergency.

4

L.A. testified that Mother had been living with her since July. Minors had clothes, blankets, and toys at her home, and there was food at the house. L.A. was willing to have the children return to her home. She had two children of her own, and was about to move from a two-bedroom to a three-bedroom home. She had cared for the children on occasion when Mother was away from home briefly. When Mother took Minors to Grandmother's house, she brought a bag with clothes, diapers, wipes, and blankets. L.A. testified that Mother did not have a cell phone, but used L.A.'s cell phone number for messages.

The jurisdiction hearing was continued to November 1, 2012. At the continued hearing, Grandmother testified that when Mother dropped the twins off at her house in August, she brought bags with diapers and two dirty outfits for each child. The initial plan was for her to leave the twins for one night.[3] She had taken care of the children in the past. Mother did not return as scheduled to pick the children up. Some time later, possibly a week and a half, she called Grandmother and "called [her] names a few times." That night, Mother sent Grandmother a text saying she was tired, that things were difficult, and that she "couldn't take it anymore" and just wanted to sleep.

Grandmother testified she was the guardian of Mother's two older daughters, M.L. and Z.L. S.L. had been primarily in Grandmother's care through an informal arrangement since November 2011. Grandmother described the arrangement as "habit," and said there was "no particular reason" S.L. had come to live primarily with her. Grandmother received a temporary probate guardianship over S.L. in July 2012, and had enrolled her in preschool. Grandmother had taken the twins to see their regular doctor, who expressed no concerns about their well-being. She had ensured that Minors received their immunizations.

Mother had dropped Minors off at Grandmother's home in the past, but had never before failed to return within a day of the expected time. When Minors were in

---

[3] Grandmother was uncertain of the date Mother dropped the twins off at her house, but it appears from her testimony it might have been August 25.

Grandmother's care, she sometimes had difficulty contacting Mother because Mother did not have her own phone. Grandmother did not know Mother's address and did not have a direct contact number.

Grandmother was concerned about Mother's ability to care for Minors. She did not always take the twins to their doctor's appointments. S.L. had eczema that was not properly treated when she was in Mother's care.

The social worker assigned to the case testified that there were no beds available for Minors in the home Mother was living in with L.A. Although L.A. was planning to move to a larger apartment, Mother did not feel comfortable in the neighborhood and did not intend to move with her. Mother was trying to arrange to live at a shelter that could take her children. The social worker would have concerns if Minors were returned to Mother due to her lack of stable housing and health concerns. Mother was pregnant, and told the social worker that due to complications in her pregnancy, she had to be monitored weekly at the hospital, and she could be admitted to the hospital at any time. Mother told the social worker that because of these health concerns, she was comfortable leaving Minors where they were. The social worker thought the placement with the grandparents was appropriate.

The juvenile court sustained the allegations of the petition, as amended to allege in allegation b-1 that Mother "failed to provide the child with adequate food, shelter and clothing in that the mother leaves the child with no provisions of support and no means for the caregiver to contact the mother in case of emergency," and in allegation g-1 that Mother "is, at present unable to care for the children because of mother's health concerns, which places the . . . children at substantial risk of harm." Based on those sustained allegations, the court found Minors came within the meaning of section 300, subdivisions (b) and (g).

## B. Disposition

According to the disposition report, Minors were currently placed with Grandmother. Mother reported that she suffered from possible anxiety, had suffered from depression, and might have a diagnosis of being bipolar. She expressed willingness

6

to engage in therapy to address those issues as well as her housing, financial, and childcare needs. She had been visiting Minors, and the visits had gone well. She was living at a shelter. The Department recommended that the children remain in their placement and Mother receive family reunification services.

At the disposition hearing, Mother's counsel stated she was "submitting on the plan under the counseling and mental health services." After a discussion of the services and visitation Mother would receive, her counsel concluded, "Otherwise we're submitting." The juvenile court adopted the Department's recommendations.

## II. DISCUSSION

### A. Jurisdiction

Mother contends substantial evidence does not support the juvenile court's jurisdictional findings under section 300, subdivisions (b) and (g). "On appeal from an order making jurisdictional findings, we must uphold the court's findings unless, after reviewing the entire record and resolving all conflicts in favor of the respondent and drawing all reasonable inferences in support of the judgment, we determine there is no substantial evidence to support the findings. [Citation.] Substantial evidence is evidence that is reasonable, credible, and of solid value." (*In re Veronica G.* (2007) 157 Cal.App.4th 179, 185.)

Section 300, subdivision (b) provides, in part, that the juvenile court may adjudge a person to be a dependent child when "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment, or by the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse. No person shall be found to be a person described by this subdivision solely due to the lack of an emergency shelter for the family." Although past events have value in considering current conditions, a finding under section 300, subdivision (b) may be found true only if circumstances at the time of

the jurisdiction hearing make it likely the children will suffer serious physical harm or illness in the future. (*In re Janet T.* (2001) 93 Cal.App.4th 377, 388; see also *In re Veronica G.*, *supra*, 157 Cal.App.4th at p. 185.)

To support her argument that substantial evidence does not support jurisdiction under section 300, subdivision (b), Mother points out that there is no evidence Minors suffered physical harm or illness when in her care; that she relied on Grandmother to care for her children when she had housing problems; that Grandmother had been willing to care for S.L. for several months under an informal arrangement; that on previous occasions when Mother brought the twins to Grandmother's house, she had returned within a day of the appointed time; and that she brought diapers and clothes for the twins when she left them with Grandmother in August and that she testified she gave half her food stamp money to Grandmother.

Viewing the record in the light most favorable to the juvenile court's findings, as we must (see *In re Veronica G.*, *supra*, 157 Cal.App.4th at p. 185), we conclude the jurisdictional findings under section 300, subdivision (b) are supported by substantial evidence. There was evidence that in August, Mother left the twins with only diapers and two dirty outfits each, and no shoes, saying she would return in a day. She did not contact Grandmother for over a week. After she finally contacted Grandmother, she sent a text saying she "couldn't take it anymore" and just wanted to sleep. Mother told the social worker she had no place to live, her life was " 'out of control' " she was " 'tired,' " and she needed "a 'break' from everything," and she had no explanation for why she had not picked up her children or contacted Grandmother. At the time of the jurisdictional orders, Mother was once again seeking housing, and she had pregnancy complications that put her at risk of a hospital stay at any moment. She did not intend to move with L.A., whom Mother had thought would care for Minors if she had a medical emergency. There was evidence Grandmother was willing to care for Minors with Department supervision or with a probate guardianship, but was no longer willing to do so on an informal basis. From this evidence, the juvenile court could reasonably conclude Minors

were at substantial risk of physical harm from being left without provision for support or medical care and without a way for a caretaker to contact Mother.

The juvenile court also asserted jurisdiction under section 300, subdivision (g), which provides for jurisdiction, inter alia, where "[t]he child has been left without any provision for support." In doing so, the trial court sustained an amended allegation that Mother was unable to care for Minors because her health concerns placed them at substantial risk of harm. Mother contends both that the allegation failed to state a cause of action and that it was not supported by substantial evidence. We have already concluded that the juvenile court properly asserted jurisdiction under section 300, subdivision (b). We need not address Mother's challenge to the subdivision (g) findings, because " 'the juvenile court's jurisdiction may rest on a single ground.' " (*In re Christopher C.* (2010) 182 Cal.App.4th 73, 83; see also *D.M. v. Superior Court* (2009) 173 Cal.App.4th 1117, 1127.)

## B. Disposition

Mother also challenges the juvenile court's dispositional order removing Minors from her care. We first note that Mother did not challenge the order below, instead submitting "on the plan." It therefore appears she has forfeited her right to appeal the removal. (See *In re Richard K.* (1994) 25 Cal.App.4th 580, 589–590 [appellate challenge to disposition forfeited where parent submitted on recommendation].) In any case, during the pendency of this appeal, Minors were returned to Mother's custody, and her challenge to the orders removing them from her care is therefore moot. (See *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1054 [appeal becomes moot when, through no fault of respondent, event makes it impossible for appellate court to grant effective relief].) We shall therefore not consider Mother's challenge to the removal of Minors from her care.

## III. DISPOSITION

The orders appealed from are affirmed.

_____
Rivera, J.

We concur:


_____
Ruvolo, P.J.


_____
Reardon, J.