Filed 5/20/26  In re D.R. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re D.R. et al., Persons Coming Under the Juvenile Court Law. | B346621 |
| _____ | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | Los Angeles County Super. Ct. No. 18CCJP04584 |
| Plaintiff and Respondent, | |
| v. | |
| M.G., | |
| Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Cristina Legaspi, Judge.  Affirmed.

John P. McCurley, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jacklyn K. Louie, Deputy County Counsel, for Plaintiff and Respondent.

_____

A mother appeals the juvenile court's decisions removing her four teenaged children from her custody and ordering her to move out of the home under section 213.5 of the Welfare and Institutions Code.  We affirm.  Undesignated statutory citations are to the Welfare and Institutions Code and rule references are to the California Rules of Court.

I

The mother has six children.

A

Two children are adults:  Oscar R., who was born in October 1999 and Freddy R., who was born in March 2003.  Four are minors:  D.R., born in June 2008; W.R., born in May 2009; and fraternal twins Je.R. and Ja.R., born in April 2011.  Ja.R. is the mother's only daughter.

Angel R. is the biological father of Oscar R., Freddy R., Je.R. and Ja.R., and the presumed father of W.R. and D.R.  W.R. and D.R.'s biological father is not involved with the family, but Angel R. raised W.R. and D.R. as his own sons.  Angel R. and the mother separated in 2018.

The family has a history of referrals to the Los Angeles County Department of Children and Family Services dating back to September 2016.

Although the Department deemed most of the allegations in these referrals to be inconclusive or unfounded, there was one incident where the Department initiated dependency proceedings.  In July 2018, Angel R. and the mother left D.R.,

2

W.R., Ja.R., and Je.R. at a Panda Express parking lot after they had a disagreement about who was supposed to take care of the children. The parents had driven separately and did not park their cars close together. The mother told the children to go with Angel R., saying "Go with dad, I'm mad at you," and locked her car doors so the children could not get in.

However, when the children walked over to Angel R.'s car, he also locked the car doors, told the children to go with their mother, and drove away. By the time the children walked back to where the mother's car was earlier, the mother was gone.

The children, then 10, 9, and 7 years old, walked four miles home, making stops along the way for water and to stay cool. Police arrested both the mother and Angel R. for child endangerment and the Department initiated dependency proceedings. After about a year of family maintenance services, the juvenile court terminated proceedings and granted sole legal and physical custody of the children to the mother. Angel R., who was convicted of child endangerment, was subject to a criminal protective order until 2021 that prevented him from seeing the children. This incident also caused the end of the romantic relationship between Angel R. and the mother.

The events leading to the underlying section 300 petition took place on an afternoon in late January 2025. That day, D.R., then age 16, had gone out of the house to buy food for the family. While D.R. was out, the mother came to the house with her boyfriend Obed S. to drop off groceries. Just before she left, Freddy R., then age 21, asked the mother for rent money. The mother said she did not need to pay anything. D.R. returned and asked Freddy R. if the mother had given him the EBT card, to which the mother responded "yes," and Freddy R. responded "no."

D.R. was upset, because the mother often left the home and did not provide enough food for them. D.R. tried to block the driveway to prevent the mother and Obed S. from leaving. At this point, Freddy R. started recording a video on his phone.

Freddy R.'s video, which is 11 seconds long, starts with Obed S. shoving D.R. out of the way and swinging his arms towards D.R.'s face. D.R. backs away, but Obed S. approaches D.R. with his hands raised. D.R. then punches Obed S. in the face, yelling "Go! You put your hands on me!" D.R. urged Je.R. to help him fight Obed S., but Freddy R. told him not to. Then, Freddy R. handed his phone to Je.R. and stopped the fight. The mother did nothing to intervene. She and Obed S. left soon thereafter.

After the fight, D.R.'s lips were bleeding and he had a bruise on his forearm. The mother did not seem worried about D.R.'s injuries. Rather, she told law enforcement that Obed S. hit D.R. in self-defense.

In early February 2025, W.R. shared the video with someone at school. That person called the Department, which began an investigation over the next few weeks. W.R. told a Department social worker that the mother "always leaves the house" and is "never home" because she is always with her boyfriend.

The social worker then called Crystal Nerio, a psychiatric social worker at D.R.'s school who had been working with him since April 2023. On the day of his fight with Obed S., D.R. went back to school and asked Nerio for help locating food pantries, which was the first time he had asked her for this kind of help since he started seeing her.

4

Nerio told the social worker that a few days after the fight, Freddy R. came to D.R.'s school because the school needed an adult to be more involved in D.R.'s education, as he had been falling behind, and the mother was absent. The school made Freddy R. a temporary education rights holder for D.R. When Nerio asked Freddy R. how life at home was, Freddy R. told her he had been the one paying rent for the past two months and that the family was struggling financially, but occasionally received help from Angel R. Freddy R. also told Nerio that the family's previous landlord had evicted them because the mother did not pay rent, despite Freddy R. giving her money for rent.

The social worker also spoke to Patricia Lopez, a psychiatric social worker at W.R.'s school who had been working with W.R. Lopez described the family as "high need[s]," and that there was "hostility" in communications between the mother and children, noting there was a great deal of conflict within the family. W.R. has been known to run away from home and frequent unhoused encampments. Moreover, both W.R. and Ja.R. have experienced sexual trauma—Oscar R. had sexually abused Ja.R. several times when she was 11, and W.R. had been molested by strangers within the last year. Lopez further reported that W.R. had been abusing drugs, including marijuana and inhalant liquid, and said the mother would need help managing his substance abuse.

The social worker then interviewed each of the children. All of them said the mother was rarely home, but when she was around, she was impatient, yelled at them, and made them feel bad about themselves. All of them confirmed that it was Freddy R. who generally took care of them, and that either Freddy R. or D.R. would buy food for the family.

First, in the interview with Ja.R., Ja.R. told the social worker the mother had been home more during the weeks following the incident with Obed S. because the police had told her that she could be arrested for child abandonment if she was not home. Ja.R. said she had seen the mother push W.R. Ja.R. also said that during an argument with the mother, the mother brought up her previous sexual trauma, saying "[I]f you can yell at me, then why didn't you yell at Oscar?"

Next, the social worker spoke to Je.R., who reported the mother would yell or scream at him if he misbehaved. The mother would hit him if he was "really bad," Je.R. said, and would use objects like a spatula or cable to discipline him. Je.R. said the last time the mother hit him was a "few months ago." As for his care, Je.R. said Freddy R. paid the household bills and groceries, sometimes with help from Angel R. Je.R. said the mother did not like paying for rent or food, and that she simply kept the money that Freddy R. had given her for rent at their last home.

The social worker's interview with D.R. echoed what the other children had told her. D.R. said that, when the mother would bring groceries to the house, it would be items like lettuce and carrots, and there would not be enough food for everyone and she would not cook for them. D.R. believed he might need to look for a job so he could help provide for the family.

Finally, the social worker spoke with W.R., who also said the mother did not provide enough food when she brought groceries home. W.R. told the social worker he had an autism diagnosis, but was not receiving services from the Regional Center.

The social worker then interviewed the mother. At that time, the mother was unemployed, but sometimes picked up "small jobs" getting groceries for others or cleaning. The mother reported having health problems, including high blood pressure, fatigue, and anxiety. She was receiving therapy and attending domestic violence classes at the East Los Angeles Women's Center.

When the social worker asked about the fight between Obed S. and D.R., the mother said she had asked Obed S. to accompany her to the house because the children would "get aggressive" with her. She did not want to give D.R. her EBT card because she believed the children would only buy "junk" food, not "real" food.

The mother also admitted she had not been in the home much recently because she was fearful of the children hurting her. Both W.R. and D.R. had been physically and verbally aggressive with her. When she was scared of W.R., she would call law enforcement to report him. She continued to provide food for the children and felt comfortable leaving them with Freddy R. because they trust him. The mother said she felt overwhelmed, and was not sure how to care for her children while also caring for herself.

B

In early March 2025, Lopez—the social worker who had been seeing W.R.—called the Department because W.R. was in the school's office, after taking a Xanax and drinking alcohol. The school had confiscated two alcoholic drinks from W.R., who said he had gotten them at a local liquor store that would sell to minors. W.R. said he wanted to take the drinks home because

7

the mother had told him that, if he was going to drink, he should do it at home.

Later that day, the school called law enforcement and paramedics took W.R. to the hospital for treatment. At the hospital, W.R. told hospital personnel that the mother did not care for him. A hospital social worker was concerned that W.R. was not getting medical care because he did not remember his doctor's name or his last visit. W.R. did not meet the requirements for a psychiatric hold at the hospital and was discharged to his mother the same day.

The following week, W.R. was admitted to Tarzana Treatment Center in Antelope Valley. However, a few days later, W.R. ran away from the treatment center. The police found W.R. and brought him back, but the treatment center would not re-admit him because he had violated its policies. The treatment center asked the mother to pick W.R. up, but she said she was afraid to do so. The mother texted a Department social worker: "I ask you if you could help me pick up [W.R.] and do [what is] necessary so DCFS becomes responsible [for] him until he is better from his addictions. If it is necessary, put him in a group home." Nevertheless, by the end of the next day, the mother, accompanied by an unidentified man, picked up W.R. from the treatment center.

A few days later, the Department filed a section 300 petition on behalf of the four children. The Department alleged (1) the January 2025 incident caused D.R. serious physical harm, and put D.R. and his siblings at risk of further harm; (2) the mother had failed to protect the children from Obed S.; and (3) the mother's limited ability to care for W.R. due to his mental

and emotional problems, behavioral problems, and substance abuse placed him and his siblings at risk of further harm.

C

In early April 2025, the initial hearing took place. The mother denied the allegations in the petition.

The Department recommended the court order a variety of services for the children, but not detain the children from the mother. The mother joined in this recommendation.

The children, through counsel, objected, asking the court to detain them from the mother and place them with Freddy R. in their current home, and to order the mother out of the home. Counsel argued the children were frustrated with the Department for not helping them. She also pointed out the mother was not only neglectful of the children, but the mother took the SSI check meant for W.R. and did not use it to pay rent or take care of them.

The court questioned each child, starting with D.R. D.R. told the court he wanted to be detained from the mother because she "usually doesn't come home." He also said that when W.R. was hospitalized recently, the mother went to Las Vegas instead of taking care of him, despite having no job. As a result, Freddy R. and D.R. went to the hospital to get W.R. at 1:00 a.m., and when they returned, the mother was still not home. The court made note of D.R.'s strong negative emotional reaction when talking about his mother, as "that speaks volumes as to the state of mind of the children."

W.R., Je.R., and Ja.R. also told the court they wanted to be detained from the mother. Each confirmed they agreed with the request their lawyer made on their behalf.

9

After expressing concern that the children were asking for "something more restrictive than what the Department wants," the court found a prima facie case under section 300 and detained the children from the mother. Over the mother's objection, the court heeded the children's request and placed them with Freddy R. in their home.

Citing section 213.5, subdivision (e), the court ordered the mother to move out of the home, noting "this is the code section that gives this court authority to order a parent or party to the case to move and vacate a home that they would have legal authority to reside and remain in." The order required the mother to be out of the home by the next day at 5:00 p.m. and the Department to visit and verify that she was gone.

The Department's jurisdiction report recommended removing the children from the mother. In an addendum report, the Department noted "[t]he children have reported feeling at ease that the Court ordered the children removed from [the mother's] temporary custody as the home environment is not disrupted by [the mother's] screaming and argumentative demeanor."

The following month, at the jurisdiction hearing, the court sustained the petition. At the children's counsel's request and over the mother's objections, the court continued the disposition hearing to allow the Department to prepare a supplemental report on its recommendation of suitable placement for the children.

In its supplemental report, the Department recommended the court continue to place the children in Freddy R.'s care under Department supervision. It also noted a social worker had spoken to the children's landlord, who agreed the children and

Freddy R. could stay in the home and he would not increase the rent. The landlord also told the social worker the children "appear happier since mother . . . left the family home."

At the disposition hearing a few weeks later, the mother's lawyer objected to the Department's recommendation. Counsel also argued section 213.5 could not be the basis for the court's decision to order the mother out of the home because she did not commit any domestic violence.

After hearing argument from all parties, the court placed the children with Freddy R. and ordered them removed from the mother. The basis for removing the children was the mother's failure to protect D.R. from Obed S., her pattern of neglecting the children and leaving them alone for extended periods of time, the children's desire to be detained from the mother, and the mother taking W.R.'s SSI money for herself. The court found there were no reasonable means to protect the children without removing them from the mother.

Then the court found that under section 213.5, subdivision (e), it had the authority to exclude the mother from the home, in spite of her status as the lessee, because the mother had allowed her boyfriend to harm D.R., and ordered her to remain outside the home.

## II

On appeal, the mother levels two challenges at the juvenile court's orders. First, she asserts substantial evidence did not support the court's removal order. Second, she maintains the court did not comply with the statutory requirements or the California Rules of Court in issuing the move-out order and violated her due process rights. Neither challenge has merit.

11

A

A juvenile court may not remove a child from a parent's physical custody unless the juvenile court finds there would be a substantial danger to the child's health, safety, or well-being if the child were returned home, and there are no reasonable means by which the child's physical health can be protected without removing the child from the parent's physical custody. (§ 361, subd. (c)(1).)

Our review of the juvenile court's dispositional finding is deferential. (See *Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012 [appellate search is for substantial evidence].)

Mother's opening brief contends the arguments for removal and the juvenile court's ruling "focused heavily on the petition allegations," which, alone, "do not automatically justify removal." She describes the petition's allegations relating to Obed S. and the mother's absences from the home as isolated incidents unlikely to be repeated and insufficient to be clear and convincing evidence supporting a removal order. And she claims the court placed too much emphasis on the children's frustration with the mother and their desire to be away from her.

There are several problems with this argument.

First, it fails to account for the other evidence upon which the juvenile court based its decision beyond the petition's allegations. Notably, the court pointed to undisputed evidence that the mother was taking W.R.'s SSI monthly payments of $1,029 for herself instead of using it to care for the children. Effectively, the mother was stealing from her children.

The court also noted the children's desire to be separated from her. Contrary to the mother's argument, it was appropriate for the court to consider the children's wishes as their counsel

12

expressed—which are relevant although not dispositive.  (See § 358, subd. (b)(1) [before disposition, court must consider "the study or evaluation made by the child advocate appointed by the court"; § 317, subd. (e)(2) [children's counsel must advise the court of the children's wishes and "shall not advocate for the return of the child if, to the best of their knowledge, return of the child conflicts with the protection and safety of the child"].)

Second, it is wrong to minimize the mother's absences from the home.  The mother made more of an effort to be home after the Department commenced proceedings.  But the record shows a pattern of neglecting the children and failing to meet their needs.  This pattern is relevant.  (See *In re John M.* (2012) 212 Cal.App.4th 1117, 1126.)  In 2018, she abandoned the children at a parking lot, causing the Department to intervene.  Her failure to pay rent at their previous home caused them to be evicted.  At the current family home, the mother denied that it was her responsibility to pay rent.  She said she did not intervene in the fight between Obed S. and D.R. because she thought she would get hurt if she tried to separate them.  She admitted avoiding the family home because she was scared of W.R. and D.R.

Third, there is evidence in the record beyond what the court cited in support of removing the mother—namely, the mother's denial of her role in causing the family's unhealthy dynamic.  When a social worker asked the mother what she believed to be the root cause of the family issues, the mother simply blamed Angel R. and the children for being difficult.  As for the fight between D.R. and Obed S., the mother denied that Obed S. had hit D.R., and denied that she had failed to protect the children.  In fact, she defended Obed S. to law enforcement, despite ample evidence of Obed S. escalating the conflict.  The

13

mother's failure to acknowledge her parenting responsibilities, her children's needs, and her own role in causing the problems at home alone are substantial evidence supporting the juvenile court's order removing the children from her.  (See *In re M.D.* (2023) 93 Cal.App.5th 836, 859.)

For these reasons, we affirm the juvenile court's decision to remove the children from the mother's custody.

B

Section 213.5 authorizes the juvenile court to issue a temporary restraining order to protect a dependent child from a parent if the parent has disturbed the peace of the child. (§ 213.5, subds. (a) & (d); see also *In re Lilianna C.* (2024) 99 Cal.App.5th 638, 644.)  This statutory authority enables a juvenile court to enter protective orders in connection with a dependency petition.  (*In re E.F.* (2021) 11 Cal.5th 320, 329 (*E.F.*))

Subdivision (e)(1) of section 213.5 authorizes restraining orders that exclude a person from a residence or dwelling.  Before issuing a move-out order, the court must find that the party to be excluded has assaulted or threatened to assault the other party. (*Id.*, subd. (e)(2).)

We independently review the question of whether section 213.5 permitted the move-out order.  (See *E.F.*, *supra*, 11 Cal.5th at p. 326.)  To the extent the mother challenges the sufficiency of the evidence, we view it in a light most favorable to the protected parties and indulge all legitimate and reasonable inferences to uphold the juvenile court's determination.  (See *In re Cassandra B.* (2004) 125 Cal.App.4th 199, 210–211 (*Cassandra B.*).)

The mother argues the juvenile court erred in finding a factual basis for the move-out order because it "equated" the fight

between D.R. and Obed S. to domestic violence, and she personally never assaulted or attempted to assault any of her children. She further claims the court failed to comply with the statute's procedural requirements and violated her due process rights by issuing the order without giving her notice. The mother points out the court did not use the Judicial Council forms, as required by rule 5.620(b).

We affirm the juvenile court's decision to issue the restraining order under section 213.5. The record contradicts the mother's claim that she never physically hurt the children. Rather, all of the children reported that the mother had hit them in the past. Ja.R. said the mother pushed W.R. Je.R. said the mother hit him with a cable and spatula, and reported that the mother had pulled Ja.R.'s hair and hit her on the back. W.R. and D.R. also confirmed the mother used to hit Je.R. and Ja.R. This evidence satisfies the statutory requirement. (See *Cassandra B.*, *supra*, 125 Cal.App.4th at pp. 210–211.)

As for the mother's procedural and due process arguments, she forfeited those by failing to raise them below. (See *In re Richard K.* (1994) 25 Cal.App.4th 580, 590 [a party generally is precluded from urging on appeal points not raised in the trial court].) Her general objection to the juvenile court's order cannot save these arguments on appeal. (See *People v. Rodriquez* (1969) 274 Cal.App.2d 770, 775 [merely interposing a general objection forfeits specific objections].)

Moreover, the juvenile court's failure to follow rule 5.620(b) procedure was harmless error. Subdivision (j) of section 213.5 specifically provides that failure to use the right form does not invalidate the order. (*Ibid.*)

## DISPOSITION

We affirm the juvenile court's orders.



WILEY, Acting P. J.


We concur:




VIRAMONTES, J.




SCHERB, J.

16