Filed 9/30/16  In re An. N. CA2/8

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION EIGHT

| | |
|---|---|
| In re An.N. et al., Persons Coming Under the Juvenile Court Law. | B270155<br>(Los Angeles County<br>Super. Ct. No. DK14933) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>R.G.,<br><br>    Defendant and Appellant. | |

Appeal from orders of the Superior Court of Los Angeles County.  Nichelle L. Blackwell, Juvenile Court Referee.  Affirmed.

Jennifer L. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and William D. Thetford, Principal Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

R.G. (mother) appeals from the jurisdiction and disposition orders entered January 22, 2016. Mother contends the juvenile court erred in asserting dependency jurisdiction pursuant to Welfare and Institutions Code section 300, subdivision (b)[1] because neither the allegations of the petition nor the evidence presented demonstrated that the two minor girls were at risk of serious physical harm. Mother further contends the court erred in removing the girls from her custody because there was no substantial evidence they were in danger of physical harm in her care.

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

Mother and A.N. (father) separated when their twin daughters (An.N. and Ar.N.) were toddlers. Both mother and father remarried. Pursuant to a family law order, mother and father shared joint legal custody, but as of December 2015, when the girls were 13 years old, mother had primary physical custody of Ar.N., and father had primary physical custody of An.N. Father and stepmother had four children together. By the fall of 2015, stepfather had separated from mother and moved out of the home, leaving no contact information.

On December 23, 2015, the Los Angeles County Department of Children and Family Services (Department) filed a petition pursuant to section 300, subdivision (b) alleging that Ar.N. and An.N. were at substantial risk of serious harm as a result of the parents' failure to adequately protect them. It was alleged the parents' ongoing and acrimonious custody battle had created a detrimental and endangering home environment, resulting in serious emotional stress and trauma to both girls. Ar.N. was alleged to be "clinically depressed" and An.N. was refusing to return to mother's home even for visits.

The Department reported that the allegations against father and stepmother, most of which were reported by mother, were unfounded. The Department further reported

---

[1] All undesignated section references are to the Welfare and Institutions Code.

that both girls indicated that mother blamed them for stepfather leaving her, and for possibly losing her home if they stayed with father because she could not keep her low-income housing if they did not live with her at least 50 percent of the time. An.N. also reported that mother, and sometimes Ar.N., blamed her and bullied her for wanting to be with father and stepmother, claiming that it was a betrayal to do so. An.N. also said mother constantly tried to "remind" her about the abuse she received by father which An.N. believed to be false, and that mother had tried to tell her what to say to the Department. An.N. told the social worker to not let mother know what she had said or that she liked being with her father and stepmother because she was fearful of mother's response. An.N. said, "[i]f my mom's reaction was so strong about me saying I didn't believe [my stepmother] was a bad person[,] I can't imagine what it would be if she knew this." During one interview, An.N. began to cry and told the social worker "I'm most scared of going back," to mother's home.

Ar.N. told the social worker that she did not sleep much and had felt increased depression "lately." Ar.N. also reported she had recently stopped taking her medication after her mother "noticed" she acted differently while taking it. Ar.N. denied having suicidal thoughts.

Dr. Ian Russ, a psychologist, provided therapeutic services to mother, father and both girls for almost two years, from November 2013 through August 2015, when mother stopped the sessions. The social worker spoke with mother and inquired about when therapeutic services were going to be started again. Mother said she had made arrangements through the girls' school and was on a waiting list. The social worker discussed with mother her belief that Ar.N. was suffering stress over the need to take care of mother because of her medical issues, that Ar.N. felt obligated to do so, and did not address her own needs as a result. Mother agreed Ar.N. needed to be able to go to therapy to talk about things. The social worker expressed her "serious concerns about . . . emotional abuse" of the girls and her concern that, even if not malicious, mother may have problems in the way she speaks to them. Mother said "I don't say anything to them."

3

Father expressed his concern about Ar.N.'s safety and the fact that "mother can't take responsibility" for anything and the burden all gets placed on Ar.N. He said An.N. had been doing well living with him and stepmother.

Margaret Linares, a student and family resource manager from the girls' school, spoke with the social worker about an incident on December 3 in which Ar.N. told a counselor she wanted to kill herself. Ar.N. had apparently been thinking about it for over a month and was planning on hanging herself. Ar.N. also reported she had been cutting herself at home. Ar.N. was taken by the school police to the hospital where she was involuntarily hospitalized for psychiatric evaluation. Ms. Linares found two blades from the school's pencil sharpener in Ar.N.'s backpack. Ms. Linares had noticed increased tension between the girls and expressed concern that the family's problems were "tearing" the girls apart.

On December 18, Ms. Linares reported to the social worker that Ar.N. had apparently been released from the hospital on December 7, but did not return to school December 18. Mother claimed Ar.N. had the flu.

The social worker made an unannounced visit to mother's home and advised her of the Department's concerns regarding the girls, including mother's failure to follow through with obtaining new therapeutic services for Ar.N. despite increased depressive episodes and the fact she appeared to be "enmeshed" with mother. The social worker advised mother of the Department's intent to detain the girls. Mother responded by saying she had only stopped Ar.N.'s medication because it made her feel "unmotivated" but that the doctors at the hospital had recommended a change to Zoloft and she was now taking that. Mother also claimed that the new therapist at the school had cancelled sessions and that was why they had not had more therapy sessions recently. Mother reiterated her previously stated concerns about father and stepmother and said "it's them" who abused the girls.

When the social worker spoke with the school therapist, Kenia Ferguson, she advised she had not cancelled any sessions. Mother cancelled one session due to alleged transportation problems. Ms. Ferguson conducted a phone session and suggested a

4

transportation service, but mother said no and said she would call back but never did. Ms. Ferguson did confirm there was no therapy scheduled the week of Thanksgiving but otherwise reiterated that she had not been the one to cancel any sessions.

The Department detained the girls and released them to father's custody. Father made arrangements for Ar.N. to stay with the maternal grandparents in order to ease her transition away from mother. The social worker observed that Ar.N. had her own room at the grandparents' home and appeared calm in their presence, although she expressed her desire to stay with her mother. Maternal grandmother told the social worker that they used to see the girls a lot more often, but recently the visits were more infrequent. She said mother had been on a "downhill slide emotionally" for the last year or two. Maternal grandmother said mother created her own reality, and Ar.N. adopts it as her own. As an example, she said that with Ar.N.'s recent hospitalization, mother told Ar.N. that the family was not supporting her, even while family members were outside waiting to visit.

The social worker documented an interview with Ar.N. on December 28, 2015, in which she reported being "26 days 'clean' from cutting and denied any current suicidal ideation." But Ar.N. acknowledged having a "mental breakdown" at school on December 18 when she was told of the Department's intent to detain her because she did not want to leave her mother.

On the same day, the social worker reported speaking with An.N. who confirmed she liked living with her father, stepmother and half siblings. An.N. reported "[l]iving there has lifted a lot of weight off my shoulders. It's normal. I'm getting As and Bs instead of Cs and Ds."

Father reiterated his concerns to the social worker about the girls' relationships with mother. He believed they were in danger, both physically and emotionally, when in her care. He felt Ar.N.'s cutting herself showed the severity of the problem.

Mother admitted to the social worker that she needed the girls to live in the home at least 50 percent of the time or she would lose her housing. She continued to deny she said anything negative to the girls about their father or stepmother. Mother told the social

5

worker she takes a lot of medication due to multiple medical problems, and has also been diagnosed with depression and anxiety. Mother reported she was unemployed on permanent disability, but that the girls were good helpers.

The social worker indicated that mother continued to deny responsibility for the situation, while father had admitted his concerns about his and mother's problems affecting the girls and appeared committed to therapy and a reunification plan.

At the January 22, 2016 hearing, at which mother was present, the court admitted without objection the Department's detention report, the jurisdiction and disposition report, and two last minute information reports dated December 23, 2015 and January 22, 2016.

The Department also presented the testimony of Dr. Russ, a psychologist with over 20 years of experience who provided therapeutic services to mother, father and both girls. Some of the family and individual sessions also included stepmother, as well as stepfather, before his separation from mother. Dr. Russ said he provided such services to the family for almost two years, from November 2013 through August 2015, when mother stopped the sessions.

In addition to providing marriage and family counseling services, Dr. Russ also works as a custody evaluator for the superior courts. He considered this family to be "one of the most high-conflict cases" that he had ever worked with. The custody battle caused "enormous stress" for both girls. An.N. had developed "more coping mechanisms" than her sister. Ar.N. had internalized the conflict more and had become "very, very depressed." She had expressed suicidal thoughts in April or May 2015.

Dr. Russ expressed concern that mother had indicated she was "using large amounts of pain medication." He said that if the girls were to be living with mother, he would recommend that an independent physician evaluate her pain medication regimen to determine if it interfered with her ability to parent.

Dr. Russ explained he was concerned about the "emotional toll" the family conflict was causing both girls, but as of the time his sessions with the family ended in August 2015, he did not believe it had risen to the point of reportable "child abuse." He

6

understood from mother that she stopped the sessions because she felt she had too much stress from them, including the fact that his office was far from their home and was difficult to get to. Mother told him she was on a waiting list to work with a therapist involved in a program sponsored by the girls' school. Dr. Russ was concerned that when mother stopped the therapy sessions with him, the family conflict was "absolutely escalating."

Dr. Russ said Ar.N. was increasingly identifying with her mother and her mother's view of things, she identified with her mother's "anger and rage" towards father and had begun "to see the world in that way." Ar.N. would come home from visits with father and talk about her perceived mistreatment by stepmother, or the fact that father and stepmother were "strict." Dr. Russ counseled mother to not have conversations about that because it did not resolve the conflict or the feelings, but mother continued to do so, feeding and perpetuating Ar.N.'s anxiety instead of diffusing it. Dr. Russ believed mother perpetuated a negative perception of father that was psychologically unhealthy for both girls.

Dr. Russ was also concerned that An.N. had expressed distress at being criticized by her mother and sister for wanting to spend time with father and stepmother, that they told her she was betraying them and she felt "emotionally beaten up" being in mother's home. When told that the girls were now living apart, Dr. Russ was concerned that could be very negative for them as they had always been close and supportive of each other.

Dr. Russ had no concerns about the girls being in the custody of father and stepmother, but was concerned about mother's "leaking feelings" negatively impacting the girls, particularly Ar.N.

The court found by a preponderance of the evidence that Ar.N. and An.N. were dependent minors within the meaning of section 300, subdivision (b). The court sustained the petition as to mother and found father to be nonoffending and struck the allegations as to father. The court noted father's willingness to engage in services and a family reunification plan. The court further found, by clear and convincing evidence as reflected in the Department's reports and the testimony of Dr. Russ, that there was

7

"a substantial danger to the physical safety and emotional well-being of both [An.N. and Ar.N.] to be in the home of their mother, and there [were] no reasonable means in which to protect these children, other than to remove them from the physical custody of their mother."

The court ordered the girls placed in the home of father, but with Ar.N. allowed to stay temporarily with the maternal grandparents as father had arranged. The parents were ordered to participate in the agreed-upon case plan, including therapy. Mother was allowed visitation with An.N. only in a therapeutic setting. Mother was granted monitored visitation with Ar.N. three times a week for a minimum of two hours. The Department was granted discretion to liberalize.

This appeal followed.

## DISCUSSION

Mother contends the court erred in asserting dependency jurisdiction. Mother concedes she did not challenge the legal sufficiency of the petition in the juvenile court. She has therefore forfeited that contention on appeal, and we need not discuss it further. (*In re Christopher C*. (2010) 182 Cal.App.4th 73, 83.)

Nor can mother challenge the adequacy of the evidentiary record supporting the court's exercise of jurisdiction. At the jurisdiction and disposition hearing, mother *expressly joined in the argument of the minor's counsel* that the court needed to assert dependency jurisdiction, and submitted to the court's jurisdiction. Mother's argument was directed only to the appropriate disposition, and the Department's recommendation to remove the girls from her custody. "In the absence of fraud, the admissions of an attorney in open court are binding upon the client." (*In re Rebekah R*. (1994) 27 Cal.App.4th 1638, 1649.) This is not a situation where mother's counsel merely submitted on the Department's reports which preserves the right to challenge on appeal the quantum and quality of evidence supporting the court's order. (See, e.g., *In re Richard K*. (1994) 25 Cal.App.4th 580, 589-590 [a mother's submission on the recommendation of the social worker, and not just the reports, to remove children from her custody forfeited right to contest disposition order on appeal].)

8

In any event, the Department's reports and the testimony of Dr. Russ establish that jurisdiction was appropriately exercised. (*In re K.S.* (2016) 244 Cal.App.4th 327, 337 [jurisdictional orders are reviewed for substantial evidence in a light most favorable to the juvenile court's findings]; see also § 355, subd. (a) [preponderance of the evidence is relevant standard for jurisdictional finding].) Dr. Russ described the family as one of the most "high-conflict" families he had ever treated.

The evidence described above is substantial and supports the court's findings that mother's own physical and emotional issues, and her inability to control how she interacted with her daughters, had created an increasingly toxic home environment, and that it was substantially likely the girls were at risk of both emotional trauma and resulting physical harm. Dr. Russ testified that when mother stopped therapy with him in August 2015, the family conflict was "escalating." Thereafter, the family dynamic continued to spiral downward, including Ar.N.'s hospitalization and An.N.'s strongly expressed fear and anxiety of being in mother's home. The evidence established that the circumstances had continued to degrade and supports the court's jurisdictional findings.

Mother also challenges the court's disposition order removing both girls from her custody. "We review a dispositional order removing a child from parental custody for substantial evidence." (*In re D.G.* (2012) 208 Cal.App.4th 1562, 1574; accord, *In re A.R.* (2015) 235 Cal.App.4th 1102, 1116.)

Under section 361, subdivision (c)(1), a dependent child shall not be taken from the physical custody of his or her parents unless the juvenile court finds by clear and convincing evidence that "[t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." " ' "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. *The focus of the statute is on averting harm to the child*." [Citation.] The court may consider a parent's past conduct

as well as present circumstances.' [Citation.]" (*In re A.S.* (2011) 202 Cal.App.4th 237, 247, italics added.)

The same evidence discussed above amply supports the court's dispositional order.

## DISPOSITION

The juvenile court's jurisdiction and disposition orders entered January 22, 2016, are affirmed.


GRIMES, J.

WE CONCUR:


BIGELOW, P. J.


RUBIN, J.