Filed 12/2/22 In re S.G. CA2/2

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re S.G., a Person Coming Under the Juvenile Court Law. | B313268 |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>H.C.,<br><br>    Defendant and Appellant. | Los Angeles County<br>Super. Ct. No. 21CCJP01891A) |

APPEAL from orders of the Superior Court of Los Angeles County, Tamara E. Hall, Judge. Affirmed.

Mansi H. Thakkar, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, Acting County Counsel, Kim Nemoy, Assistant County Counsel, and Sarah Vesecky, Senior Deputy County Counsel, for Plaintiff and Respondent.

Appellant H.C. (Mother) challenges court orders sustaining a dependency petition and removing her children from her custody. (Welf. & Inst. Code, §§ 300, 361.)[1] She argues that one incident of domestic violence by her partner does not justify dependency jurisdiction. However, the record supports a finding of prior instances of violence. The record also supports removal. Mother is protective of the perpetrator, to her children's detriment. She initially denied that violence occurred, then falsely blamed her child for it. She and her partner deterred the children from speaking to investigators. The court disbelieved Mother's claim that the perpetrator has moved from her home, which poses a substantial risk of future harm. We affirm.

**FACTS AND PROCEDURAL HISTORY**

Mother has two daughters: S.G. (born in 2010) and C.C. (born in 2015). L.C. is C.C.'s presumed father. S.G.'s non-offending father, M.G., submitted to the court's jurisdiction. Neither father is a party to this appeal.

In March 2021, police responded to reports of domestic violence at the family home, where Mother and L.C. had an altercation. When S.G. intervened, L.C. choked her, grabbed her by the hair, slammed her around, and struck her face. L.C. punched Mother, injuring her face. He was arrested. Mother refused an emergency protective order (EPO). Both parents were drinking when the violence occurred.

A social worker (CSW) from respondent Los Angeles County Department of Children and Family Services (DCFS) investigated the children's safety. L.C. refused to allow CSW into

---

[1] Undesignated statutory references are to the Welfare and Institutions Code.

2

the home or speak to her without a warrant. CSW returned the next day, with a warrant. L.C. was evasive and refused to answer questions; Mother called the event "a misunderstanding," did not recall if there was physical violence, and accused S.G. of exaggeration. Though Mother's face was bandaged, she was "not sure" how she sustained the injury. Asked about the altercation, Mother said, " 'I would not call it domestic violence.' "

When CSW asked to speak with 11-year-old S.G., L.C. said he wanted to reschedule, to allow his attorney to be present. CSW informed L.C. that the warrant allowed her access to the children. S.G. was talkative but clammed up when asked about domestic violence. She denied remembering what happened but touched her throat throughout the interview. L.C. told CSW he eavesdropped on S.G.'s interview and felt that the questions were unnecessary. L.C. interrupted CSW's interview of six-year-old C.C. After he left, C.C. told CSW, when asked about the incident involving police, " 'Let's not talk about it because dad does not want us to talk about it.' "

Mother minimized the incident. She recalled being on the floor but "was not sure if [L.C.] pushed her or she fell." She blamed S.G. for attacking L.C., who had "to defend himself." She was unsure if L.C. choked S.G., though she may have told police that he did. She said that L.C. moved out of the home.

On April 20, 2021, the court authorized the children's removal. DCFS filed a petition alleging that the children are at risk of serious harm from L.C.'s violence and Mother's failure to protect them. At the detention hearing, the court detained C.C. from her parents and detained S.G. from Mother. Citing the parents' denials of wrongdoing, the court found a substantial danger to the children's physical and emotional health. It

ordered the parents not to discuss the case with the children. L.C. is not allowed to have contact with S.G.

In its report for the jurisdiction hearing, DCFS wrote that S.G. is placed with her non-offending father and C.C. is with her grandmother. Describing the incident, S.G. said L.C. " 'was being mean to mom. . . . I heard a scream. [L.C.] threw mom on the floor. He was kicking and hitting her. I jumped on him. He held me by the neck to hold me back.' " Asked about prior incidents of violence, S.G. said, " 'Stuff used to happen before, but not [nearly] as bad.' " C.C. did not see the incident but learned that S.G. tried to defend Mother and "thought [L.C.] was choking her."

L.C. wrote to say he was ashamed that a "verbal disagreement" with Mother devolved into "a tussle" while he was intoxicated. He pushed Mother, then restrained her when she hit him. S.G. intervened and hit L.C., who claimed he "put [his] hand up by her shoulder to stop and restrain her" while "telling her to calm down." L.C. did not admit to harming S.G.

Mother said she was angry the day of the fight because L.C. said they would never marry. She went for a walk. On her return, L.C. pushed her down and began hitting her. S.G. heard the commotion and ran downstairs to protect Mother. S.G. jumped on L.C. and hit and kicked him. Mother saw L.C. put his hand on S.G.'s neck. Mother began kicking and hitting L.C., who punched her. Mother ran to a neighbor's home to call 911, saying L.C. hit her and choked S.G.

The police report states that Mother called 911 and said L.C. pushed her onto the floor and hit her, then choked S.G. when the child tried to stop him. When police arrived, Mother said she and L.C. were drinking and argued. She went for a walk and L.C. pushed her onto the floor when she returned. S.G. tried to

4

protect Mother by hitting L.C., who held S.G. by the throat in "a C-clamp." Mother kicked L.C. to protect S.G. L.C. then punched Mother in the face with his fist. Officers saw a laceration and redness under Mother's left eye.

S.G. told officers she heard screaming, went downstairs, and saw L.C. "yank" Mother to the floor and kick her. S.G. feared Mother was "dead" and began to scream at L.C. that he is a "bad guy." L.C. grabbed S.G. by the throat, making it hard for her to breathe; she said her throat felt "different" afterward. Mother fought L.C. and told him not to harm S.G. L.C. pulled S.G.'s hair very hard, causing her pain, "slammed her head around the room," and struck her face with his hand.

Before the jurisdiction hearing, Mother and L.C. enrolled in parenting and domestic violence classes and intended to begin counseling. Mother advised CSW that Father continued to come to her home "on his own"; she believed he could enter until he was evicted from the residence but now realizes that she could keep him out. Mother wrote that L.C. "did not punch [S.G.], throw her around the room, 'PUSH' [S.G.] by the neck, nor punch me continuously." DCFS asked the court to declare the children dependents, then terminate jurisdiction over S.G., giving full physical and legal custody to her father.

At adjudication, on May 19, 2021, DCFS and counsel for the children asked the court to sustain the petition in its entirety. Mother's counsel noted that her client promptly called 911, adding, "We are submitting on the allegations as pled." L.C. asked for a dismissal because there was "one isolated incident of domestic violence" and the children are not exposed to recurring violence. He denied choking or hitting S.G. or pulling her hair.

5

He is remorseful and is addressing the issues in classes and counseling.

The court sustained the petition. It stated that Mother's and S.G.'s statements to police "are the most credible" because Mother had no time to reflect and S.G. had no reason to lie. Later, Mother and L.C. devised "a different story" that "minimizes what took place, blames [S.G.], and shows that they were both in complete denial." Mother failed to protect the children because she declined an EPO and accused S.G. of exaggeration. S.G. was consistent, telling police and DCFS she intervened when she saw L.C. put his hands on Mother. Instead of walking away, L.C. grabbed S.G. by the neck, to the point she was gasping for air, and pulled her hair. When Mother tried to stop L.C., he punched her face, and police saw the injury. The court found S.G.'s statements "more credible than the Mother['s] and Father's statements." It believed S.G.'s disclosure that there were prior incidents of violence.

Disposition was delayed to determine if L.C. was still living in the family home. L.C. told DCFS that he goes to the home because "he runs his business out of his house and has multiple trucks at the home with tools that he needs to use to conduct his business," and it is expensive to stay elsewhere. L.C. said he examined the court's minute order "and noticed it doesn't include anything about him staying out of the home."

L.C. later wrote to DCFS to say that he either stays at a hotel or with his sister. He attached some hotel receipts. He has removed his "trucks and necessities" from the family home and intends to obey all court orders and meet DCFS's expectations. Mother also wrote to say that L.C. does not live at home. They

have separated.  She is learning about domestic violence in her classes and is not minimizing what occurred.

At disposition, on May 28, 2021, the court found it necessary to remove the children.  It did not believe L.C. has left the family home, and "It's not in the best interest of the children to be placed and be left in this type of home when the mother is blaming the child, who came to the mother's protection.  And the mother right now is in denial."  It ordered Mother to participate in domestic violence and parenting programs, and counseling to address self-esteem, domestic violence, and its effect on children.  Her visits are monitored.  The court placed S.G. with her father and terminated jurisdiction with a juvenile court custody order awarding him sole legal and physical custody.[2]

## DISCUSSION

### 1. Dependency Jurisdiction

*a. No Waiver of Claim*

DCFS contends that Mother cannot challenge jurisdiction because she acquiesced to it.  Her attorney said, "We are submitting on the allegations as pled," telling the court that Mother called 911, enrolled in programs, and separated from L.C. to show that she protects her children.  The juvenile court did not treat counsel's statements as a concession that Mother acquiesced to jurisdiction, nor did it make the required findings that Mother waived her due process rights.  (Cal. Rules of Court, rule 5.682(e)(3) [if a parent does not contest jurisdiction, the court must find that the right to trial is knowingly and intelligently

---

[2] The court removed C.C. from Mother and L.C.  That order is not challenged on appeal.

waived, the parent understands the consequences and freely admits to the misconduct].)

Here, counsel sought, inartfully, to submit on the record. "Notwithstanding a submittal on a particular record, the court must nevertheless weigh evidence, make appropriate evidentiary findings and apply relevant law to determine whether the case has been proved. [Citation.] In other words, the parent acquiesces as to the state of the evidence yet preserves the right to challenge it as insufficient to support a particular legal conclusion. [Citation.] Thus, the parent does not waive for appellate purposes his or her right to challenge the propriety of the court's orders." (*In re Richard K.* (1994) 25 Cal.App.4th 580, 589.)

b. *Substantial Evidence Supports Jurisdiction*

We uphold jurisdictional findings " 'if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court." ' " (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

The sustained finding against Mother requires a showing that "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent or guardian to adequately supervise or protect the child." (§ 300, subd. (b)(1).) Our primary concern is a child's best interests. Courts "need not wait for disaster to strike before asserting jurisdiction." (*In re K.B.* (2021) 59 Cal.App.5th 593, 603.)

8

Domestic violence justifies dependency jurisdiction. " ' "Children can be 'put in a position of physical danger from [parental] violence' [by], 'for example, . . . wander[ing] into the room where it was occurring and be[ing] accidentally hit by a thrown object, by a fist, arm, foot or leg . . . .' " ' " ' . . . [A] juvenile court may invoke jurisdiction under section 300, subdivision (b), even if a child has emerged physically unscathed from an instance of domestic violence." (*In re L.O.* (2021) 67 Cal.App.5th 227, 239 (*L.O.*); *In re R.C.* (2012) 210 Cal.App.4th 930, 943 [affirming jurisdiction though the child who saw an altercation "was not physically hurt"].) Past violent behavior is the best predictor of future violence. (*L.O.,* at p. 238.)

L.C. attacked Mother in S.G.'s presence. When S.G. intervened, she was physically assaulted by L.C., who choked her until she had difficulty breathing, pulled her hair so hard that it caused her pain, slammed her around, and hit her face. He was arrested for his attacks on Mother and S.G.

Mother argues that no substantial evidence supports a finding of prior instances of violence. The record belies her claim. It shows that when CSW asked "about prior domestic violence incidents," S.G. replied, "stuff used to happen before, but not as much as bad [*sic*]." The court cited S.G.'s reply when it found "there have been prior incidents, but not as bad as this one, [which] shows there is a history of domestic violence."

The standard of review requires us to consider if *any* evidence—contradicted or uncontradicted—supports the court's findings. S.G.'s reply about "prior domestic violence incidents" is substantial evidence. (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451 [evidence from one witness is sufficient].) Mother posits that S.G. did not understand the term "domestic violence" and her use

of the word "stuff" is ambiguous. Mother did not call S.G. to testify about prior incidents, which may have elicited information detrimental to Mother and L.C. The record shows that S.G. is articulate and understands why DCFS is involved. The court found "credible" her statement about prior incidents.

Mother cites Clerk's Transcript page 18 as proof that there were no prior incidents of violence. The cited page does not support her claim. Even if Mother denied prior violence, the court deemed her to be a witness who lacks credibility.

Apart from citing prior incidents of domestic violence, the court found "Mother did fail to protect because she declined an EPO, she declined a restraining order. And she stated that her child, an 11-year-old, is exaggerating the facts." In Mother's case, the court correctly perceived that "One cannot correct a problem one fails to acknowledge." (*In re Gabriel K.* (2012) 203 Cal.App.4th 188, 197.)

Mother and L.C. tried to derail the DCFS investigation. L.C. admitted this "is the strategy that they tried." They personally denied responsibility and coached the children to withhold information. C.C. bluntly told CSW that L.C. instructed her not to talk about the incident; S.G. pretended not to remember the event. Mother told CSW she was "not sure" why her face was bandaged, though the officers who responded to Mother's 911 call saw a laceration L.C. caused when he punched her. Mother said, "I would not call it domestic violence." " ' "[D]enial is a factor often relevant to determining whether persons are likely to modify their behavior in the future without court supervision." ' " (*L.O., supra,* 67 Cal.App.5th at p. 240; *In re Giovanni F.* (2010) 184 Cal.App.4th 594, 601 [parent's denial of violence increases risk].) A person who denies abuse is likely to

10

resist services needed to ensure that a child will not be at risk. (*In re Esmeralda B.* (1992) 11 Cal.App.4th 1036, 1044.)

Substantial evidence supports the finding of a risk of future harm. Mother falsely said L.C. had to "defend himself" from S.G. In fact, S.G. was trying to rescue Mother from L.C., who was kicking and hitting Mother after throwing her to the floor. Mother told CSW the incident was "a misunderstanding," accused S.G. of exaggeration, and claimed she did not recall if the incident was physical. Mother later realized that lying was ineffectual and admitted there was violence, yet she allowed L.C. to stay in the home. Her rationale—fear of DCFS involvement—does not excuse her choice to support a ploy to thwart DCFS instead of defending her children's safety.

It is immaterial that no fights were reported after DCFS intervened; unsurprisingly, the parents abstained from fighting while under supervision. Even if Mother were to end the relationship, L.C. will continue to see C.C. "Accordingly, Father will likely encounter Mother . . . in the foreseeable future." (*L.O., supra,* 67 Cal.App.5th at p. 240; *In re R.C., supra,* 210 Cal.App.4th at p. 940 [when parents have children together " '[t]hey're still going to be interacting with each other' "].) L.C.'s failure to acknowledge his violent behavior creates "a risk that he will once again attack Mother in [the child's] presence." (*L.O., supra,* 67 Cal.App.5th at p. 240.)

### 2. Disposition

Mother contends that the disposition must be reversed because no evidence supports jurisdiction. As discussed above, the record supports jurisdiction. She also argues that removal was improper because there is no risk of danger to S.G. and there are other means available to protect the child short of removal

11

from custody. Mother does not contest the order giving S.G.'s father full custody and terminating dependency jurisdiction.

The court may remove a child from parental custody upon clear and convincing evidence of "a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor." (§ 361, subds. (c)(1), (d).) The court must state the facts underlying its decision to remove the child. (§ 361, subd. (e).) We examine the entire record for substantial evidence showing a high probability that the facts support removal. (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011–1012; *In re I.R.* (2021) 61 Cal.App.5th 510, 520.)

After the court delayed disposition for an investigation into L.C.'s continued presence in the family home, L.C. told DCFS that he runs his business from the home, it is expensive to stay elsewhere, and no court order bars him from going home. He later claimed to be staying with his sister or at a hotel. At disposition, the court stated that it does not believe L.C. has left the home, necessitating the children's removal.

Substantial evidence shows L.C. is violent, yet he denied harming S.G., claiming he only touched her shoulder and told her to calm down. Removal is necessary when the "inference from [his] denial [of domestic violence] is that he is less likely to change his behavior in the future." (*In re V.L.* (2020) 54 Cal.App.5th 147, 156.) If anything, the risk to S.G. may be increased because she disobeyed L.C.'s coaching, told DCFS the truth, and the court believed her.

The court did not believe Mother's claim that L.C. no longer poses a risk. She refused an EPO and allowed L.C. to remain in the home with S.G. for three weeks after the violent incident, until DCFS told her it would obtain a removal order. Meanwhile,

12

L.C. and Mother were dishonest about the violence and coached the children to lie.  The court only believed Mother's initial statement to police, before she and L.C. concocted stories and could readily reject her claim that L.C. is not in the home.  L.C. told DCFS shortly before the disposition hearing that no court order bars him from the house, where he goes to run his business.  L.C.'s acknowledgement that he continued to be in the home belies Mother's claim that he left before the detention hearing.  Removal is necessary to protect the children's safety.

## DISPOSITION

The jurisdiction and disposition orders are affirmed.
NOT TO BE PUBLISHED.


LUI, P. J.

We concur:



HOFFSTADT, J.



BENKE, J.*

---

*Retired Associate Justice of the Court of Appeal, Fourth Appellate District, Division One, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.