Filed 9/1/23  In re Daisy G. CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re DAISY G. et al., Persons Coming Under the Juvenile Court Law. | B324988 (Los Angeles County Super. Ct. No. 18LJJP00767) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. D.P., Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Pete R. Navarro, Judge Pro Tempore.  Affirmed.

William Hook, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, David Michael Miller, Deputy County Counsel, for Plaintiff and Respondent.

—————————————————

In this dependency case (Welf. & Inst. Code, § 300 et seq.),[1] D.P. (Mother) appeals from the juvenile court's order terminating parental rights to three of her daughters, then ages four, three, and two. The Los Angeles County Department of Children and Family Services (DCFS) had detained each of these children from Mother within a few months of birth, and they remained out of her custody for the duration of these proceedings.

Mother contends the juvenile court erred in not continuing the section 366.26 permanency planning hearing for preparation of a bonding study, which the court had ordered three months prior at Mother's request, but Mother had not obtained. She does not challenge the substance of the court's order terminating parental rights based on the evidence before it.

As explained more fully below, there was no error. Mother did not request that the juvenile court continue the section 366.26 hearing for preparation of the bonding study. Mother consented to proceeding with the hearing without the bonding study. Even if Mother had requested a continuance of the section 366.26 hearing and had preserved her contention for appellate review, she did not show the requisite good cause for a continuance of a hearing in a dependency matter under section 352, subdivision (a).

—————————————————

[1] Further statutory references are to the Welfare and Institutions Code.

2

# BACKGROUND

The present dependency proceedings involve Mother's daughters Daisy, Dakota, and Daphne, and not their older half siblings, who were removed from Mother's custody and placed with their father in 2015.  In those prior dependency proceedings, the juvenile court sustained allegations against Mother due to domestic violence by and against the half siblings' father, Mother's mental and emotional problems, Mother's substance abuse, and Mother's emotional abuse of one of the half siblings.  In 2016, the juvenile court terminated jurisdiction in the prior dependency proceedings, with a custody order granting joint legal custody, sole physical custody to the half siblings' father, and monitored visitation for Mother.

## I.    Commencement of Present Dependency Proceedings as to Daisy

In November 2018, DCFS sought and obtained an order removing two-and-a-half-month-old Daisy from Mother and D.G. (Father) due to domestic violence between Mother and Father for which Father was arrested.[2]  Upon removal, DCFS placed Daisy in a foster home.  On November 16, 2018, DCFS filed a dependency petition alleging, among other things, that Mother and Father's history of violent altercations placed Daisy at risk of serious physical harm, within the meaning of section 300, subdivision (a).

---

[2] Father is not a party to this appeal.  He is the father of the three children involved in the present dependency proceedings, Daisy, Dakota, and Daphne; he is not the father of their older half siblings mentioned above.

On February 7, 2019, at the adjudication and disposition hearing, Mother and Father pleaded no contest to the domestic violence allegations under section 300, subdivision (a), and the court sustained the dependency petition as amended. The court declared Daisy a dependent of the court, removed her from Mother and Father, and ordered her suitably placed under DCFS's supervision. The court granted Mother and Father reunification services and twice-weekly monitored visitation, to occur separately. Daisy remained in foster care, and the court ordered DCFS to assess the paternal grandmother as a potential placement for Daisy.

## II. Commencement of Present Dependency Proceedings as to Dakota and Continuation of Proceedings as to Daisy

Mother gave birth to Dakota, her second child with Father. In July 2019, DCFS sought and obtained an order removing three-week-old Dakota from Mother and Father based on the history of domestic violence between Mother and Father, and information DCFS had received indicating Mother and Father were still interacting with one another in violation of a criminal protective order disallowing Father to contact Mother. DCFS placed Dakota with the paternal grandparents. Older sister Daisy remained placed in foster care.

On July 30, 2019, DCFS filed a dependency petition under section 300, subdivisions (a), (b), and (j), alleging, among other things, Mother and Father's history of violent altercations placed Dakota at risk of serious physical harm. At the July 31, 2019 detention hearing for Dakota, the juvenile court ordered twice-weekly monitored visitation for Mother and Father, to occur separately.

4

As to Daisy, who was then nearly 11 months old, DCFS reported that she appeared to have "a close bond" with her foster parents as well as Mother and Father. At the end of July 2019, DCFS placed Daisy on an extended visit with the paternal grandparents (where newborn sister Dakota had already been placed); and in August 2019, DCFS officially placed Daisy there.

Mother visited Daisy and Dakota at the paternal grandparents' home around four days per week (and Father visited on the other days). In September 2019, DCFS required Mother to have her visits at a DCFS office due to Mother's conflict with the paternal grandmother. Mother's twice-weekly monitored visits at the DCFS office were reportedly appropriate.

At the December 10, 2019 adjudication and disposition hearing for Dakota, the juvenile court sustained allegations in a first amended petition under section 300, subdivisions (b) and (j), regarding Mother and Father's history of domestic violence (and Father's marijuana abuse). The court declared Dakota a dependent of the court, removed her from Mother and Father, and ordered reunification services and monitored visitation for Mother and Father, to occur separately. Dakota remained placed with the paternal grandparents, along with Daisy. Later that same month, during a Christmas visit at the paternal grandparents' home, a violent altercation occurred between Mother and Father and between Mother and the paternal uncle's girlfriend, and Mother was arrested.

In an August 2020 Status Review Report, DCFS stated that Daisy and Dakota had "a strong bond and connection" with the paternal grandparents. DCFS also reported that prior to the start of the COVID-19 pandemic, Mother continued to have twice-weekly monitored visits with the girls, which occurred at a

DCFS office or a park. During a January 2020 visit, when Daisy was around 16 months old and Dakota was around six months old, the monitor noted Mother "had strong parent child interaction and strong bonding with both children." In person visits were temporarily suspended due to the pandemic. In June 2020, Mother's monitored visits resumed once a week at a park.

At a September 21, 2020 review hearing regarding Daisy and Dakota, the court terminated Mother's and Father's reunification services and set a section 366.26 permanency planning hearing on January 19, 2021. The court ordered the children to remain placed with the paternal grandparents and ordered monitored visitation for Mother (and Father) to occur three times per week. The same day, the court sustained allegations in a section 342 subsequent petition regarding Mother's and Father's ongoing violent altercations with each other (and other individuals) in the paternal grandparents' home.

III. **Commencement of Dependency Proceedings as to Daphne**

Meanwhile, in late August 2020, Mother had given birth to Daphne, her third child with Father. In October 2020, after an investigation, DCFS obtained an order removing one-and-a-half-month-old Daphne from Mother and Father based on, among other things, the history of domestic violence between Mother and Father and their continued interaction with one another in violation of the criminal protective order, which was still in effect. DCFS placed Daphne in foster care.

On October 19, 2020, DCFS filed a dependency petition alleging, among other things, that Mother's and Father's neglect of Daphne's siblings (including the half siblings) within the meaning of section 300, subdivision (j), placed Daphne at risk of

harm. The petition included allegations regarding Mother and Father's history of violent altercations (count j-1), Father's marijuana abuse (count j-2), Mother's history of substance abuse (count j-3), and Mother's history of mental and emotional problems (count j-4).

At the October 23, 2020 detention hearing, the juvenile ordered DCFS to assess the paternal grandparents as a potential placement for Daphne. The child remained in foster care. The court ordered monitored visitation for Mother (and Father) to occur as frequently as the monitor was available.

At the December 16, 2020, adjudication hearing for Daphne, the juvenile court sustained the allegations in the petition against Mother and Father under section 300, subdivision (j) (counts j-1—j-4 listed above involving sibling abuse or neglect). At the disposition hearing for Daphne, held on January 19 and 21, 2021, the court declared Daphne a dependent of the court, removed her from Mother and Father, and granted Mother and Father reunification services (notwithstanding the prior termination of reunification services as to Daisy and Dakota) and monitored visitation. The court ordered DCFS to assess the paternal grandparents as a potential placement for Daphne and gave DCFS discretion to place Daphne there. Daphne remained in foster care.

At the July 20, 2021 six-month review hearing (§ 366.21, subd. (e)) for Daphne, the juvenile court continued Father's reunification services and terminated Mother's reunification

7

services, finding she was not in compliance with her case plan.[3] On August 13, 2021, DCFS placed Daphne with the paternal grandparents.

## IV.   Mother's Visitation With the Children

For more than a year, between May 20, 2021 and August 11, 2022, Mother's in person visits were suspended by the juvenile court due to Mother's inappropriate behavior.  Leading up to the suspension, DCFS informed the juvenile court that members of its staff had reported "grave safety concerns as to [Mother]'s ability to parent and keep the children safe" during monitored visits.  On one occasion, Mother reportedly "became aggressive and violent while holding the infant Daphne" during an argument with a monitor.  On several occasions, Mother allowed her two toddlers to wander around a park (and once a parking lot) without supervision and relied on the monitor to redirect them.  Mother became upset if the toddlers showed any attachment to the monitor and, during one visit, she reprimanded then-two-and-a-half-year-old Dakota for doing so and ended the visit early.  After a monitor spoke with Mother about the safety concerns, Mother instructed the toddlers not to speak to the monitor, which "create[d] confusion and anxiety for the children."

When the juvenile court suspended Mother's in person visits in May 2021, it allowed her to have monitored virtual visits.  For around the next six months, Mother was inconsistent

---

[3] Later, in February 2022, the juvenile court terminated Father's reunification services and set Daphne's case for a section 366.26 hearing with her siblings on June 21, 2022.  The section 366.26 hearing for Daisy and Dakota had been continued multiple times since January 19, 2021.

in attending virtual visits with the children. Beginning around December 2021, Mother consistently attended 20-to-40-minute weekly virtual visits that went well, according to DCFS staff who monitored the visits. In May 2022, DCFS informed the juvenile court that the paternal grandparents and the children's day care provider reported the children had "an increase in behaviors following virtual contact [with Mother] and fe[lt] this would only be exacerbated by in person visitation."

Also in May 2022, a year after the suspension of her in person visits, Mother filed a section 388 petition seeking reinstatement of reunification services. She attached documentation indicating she had been seeing a therapist since January 2022 and had been taking medication for her mental health conditions. At an August 11, 2022 hearing, the juvenile court denied Mother's section 388 petition, but allowed in person monitored visits with the children to resume.[4]

V.     **Order for a Bonding Study and Mother's Ineffectual Efforts to Obtain a Bonding Study Over A Three-Month Period**

At the August 11, 2022 hearing referenced above, Mother's counsel requested that the juvenile court order a bonding study for Mother and the children. The court expressed the opinion that bonding studies "serve little value" where the children are very young (then, ranging in age from two to nearly four). The court commented that "small children relate to and connect with those adults who feed them, clean them, and play with them," i.e., the caregiver. The court cautioned Mother's counsel that a

---

[4] Mother filed numerous section 388 petitions in this case. All were denied.

"bonding snapshot[],"—a brief observation at a monitored visit—"may just cut the other way," against Mother's position. Nonetheless, over objection from counsel for DCFS and the children, the court ordered a bonding study pursuant to Evidence Code section 730 and signed an order for the appointment of an evaluator. The court set September 15, 2022 as the date for receipt of the bonding study, in advance of the section 366.26 hearing scheduled for September 21, 2022.

Before the September 21, 2022 section 366.26 hearing, DCFS submitted a Last Minute Information for the Court recommending the juvenile court terminate parental rights. DCFS noted that the parental grandparents' home study was complete, and they were committed to adopting the children. Mother had had six in person, monitored visits since the August 11, 2022 hearing when the court allowed her in person visits to resume. The DCFS monitor reported that during the first visit, "the children were hesitant to engage with [M]other but within the first half of the visit warmed up to [M]other by seeking her attention and appearing comfortable in her presence." Mother's visits were appropriate. She engaged the children in activities with materials she brought, and she was responsive to their needs, remaining calm when the children misbehaved and redirecting them with positive reinforcement.

On September 21, 2022, Father filed a section 388 petition requesting custody of the children or liberalized visitation and/or reinstatement of family reunification services. At the section 366.26 hearing held the same day, the juvenile court set Father's section 388 petition for a hearing on October 28, 2022, and continued the section 366.26 hearing to the same date.

10

During the September 21, 2022 hearing, Mother's counsel informed the court that his office had tried multiple times to schedule a bonding study evaluation with the appointed evaluator and had received no response from her office. Counsel asked the court if he could "try to contact Dr. Kaser-Boyd." The court responded that Dr. Kaser-Boyd was "very busy," and it was "highly unlikely" she would be able to complete a bonding study report by the October 28, 2022 section 366.26 hearing. The court asked Mother's counsel to contact Dr. Kaser-Boyd the following day, September 22, 2022, to see if she could complete a bonding study report by October 28, 2022. Counsel agreed. The court admonished Mother's counsel, "That bonding study – you got to get some action on that."

In advance of the October 28, 2022 section 366.26 hearing, DCFS filed a Last Minute Information for the Court. Therein, DCFS stated, in pertinent part: "On 08/11/2022, the Court ordered a bonding study as to minor[s] and Mother pursuant to Evidence Code section 730. As of the writing of this report [October 26, 2022], DCFS has not been informed as to any bonding studies taking place. DCFS is dismayed as to the length of time it is taking to initiate this process." DCFS also reported, among other things, that Mother's in person, monitored visits with the children were consistent and appropriate.

On October 28, 2022, the hearing on Father's section 388 petition and the section 366.26 hearing commenced.[5] Without objection, the court admitted into evidence exhibits offered by DCFS on both matters and an exhibit offered by Father in

_____

[5] The juvenile court had continued the section 366.26 twice since June 21, 2022.

11

support of his section 388 petition.  After hearing argument from the parties on Father's section 388 petition, the court took the matter under submission and continued the hearing on both matters to November 17, 2022.  Mother's counsel stated he had believed the section 366.26 hearing was going to proceed that day on October 28, 2022, and he had a witness present who was ready to testify.  He asked the court to order the witness to reappear at the continued section 366.26 hearing in November, and the court so ordered.  Mother's counsel did not mention the bonding study; nor did anyone else.

At the hearing on November 17, 2022, the juvenile court denied Father's section 388 petition and turned to the section 366.26 matter.  Without prompting from the parties, the court inquired about the status of the bonding study, and the following exchange occurred between counsel and the court:

"[Mother's counsel]:  "At this time a bonding study has not been done.  The 730 evaluator isn't available to do the bonding study.  And as of yet we have not found another person to do the assessment for Mother.  [¶]  My understanding is that one of the assessors in Lancaster -- she recently went through a car accident and is unable, as well, to do any bonding studies at this time.

"The court:  Well, are you requesting that another evaluator be appointed?

"[Mother's counsel]:  That would be Mother's request[].  But I don't know who would be available at this time to do such a bonding study.

"[¶] . . . [¶]

"[The court:]  And so, [Mother's counsel], what do you want to do?

12

"[Mother's counsel]: I know that we have sought to do the bonding study. We have not been able to get anybody to do it. If the court continues the hearing for that purpose, I will try to find another evaluator to do the bonding study with Mother.

"The court: Well, as to the .26, is the Department prepared to proceed today?

"[DCFS's counsel]: Yes, Your Honor. [¶] The Department's Exhibits 1 through 10 were admitted October 28th.

"The court: And Father's counsel, as to the .26?

"[Father's counsel]: I am prepared to proceed on the .26 for Father.

"The court: All right. And, mom, mom's counsel, Mother's counsel?

"[Mother's counsel]: I am prepared to proceed on the .26. We subpoenaed the H.S.A. [Human Services Aide] worker, Magdalena Castro, today to testify.

"The court: She was ordered back.

"[DCFS's counsel]: She is on call, Your Honor. She called in this morning.

"The court: Do you want to call her now or after 1:30?

"[Mother's counsel]: Whenever the court would like to call the case, Your Honor.

"The court: Well, we can start. We can start with her.

"[Mother's counsel]: Then I am ready."

There was no further discussion about the bonding study, and the section 366.26 hearing proceeded to completion, as discussed below.

13

## VI.   Section 366.26 Hearing and Order Terminating Parental Rights

Immediately after the above discussion regarding the bonding study, Mother called Magdalena Castro, a DCFS Human Services Aide, as a witness.  She testified that she monitored half of Mother's visits (in person visits, and before those resumed, telephonic visits), and a caseworker monitored the other half. Castro described the visits as follows:  "In general the visits are very positive.  The Mother has been constant with the visits, and she is appropriate with the children.  She communicates well. She shows lots of love to the children.  And I have no concerns whatsoever with the visits."  According to Castro, the children were happy to see Mother; they were receptive to her affection; and they brought things to show her (e.g., toys and four-year-old Daisy's school work).  They called her " 'mommy.' "  The children did art projects and sang and danced with Mother during visits. Mother successfully redirected them when they misbehaved. Based on her observations, Castro believed that "all three children seem to be very bonded with Mother.  They seek her affection.  When they trip, for example, and fall, they cry and come to her for comfort.  Mommy comforts them.  And the children are fine after that.  So they have a very good – they are very receptive to each other."  When visits ended, the children were usually calm and happy, except on one occasion when then-three-year-old Dakota appeared sad, and Daisy told Castro, " 'It is because she misses mommy.  She wants to live with mommy.' " During an exchange with DCFS's counsel after Castro's testimony, the juvenile court stated it was "treating her testimony [regarding the bond between Mother and the children] as observations only," and "[n]ot an expert opinion."

Mother was present via Webex, but she did not testify at the section 366.26 hearing. Her counsel argued the parental-benefit exception to termination of parental rights (§ 366.26, subd. (c)(1)(B)(i)) applied to her relationship with the children. Father's counsel requested the juvenile court order a permanent plan of legal guardianship instead of adoption for the children. Counsel for DCFS and the children urged the juvenile court to terminate parental rights. The court took the matter under submission.

At a continued section 366.26 hearing on November 23, 2022, the juvenile court presented its ruling. Mother was present via Webex. There was no discussion at this hearing about a bonding study. The court found that no exception to termination of parental rights applied. Regarding the parental-benefit exception, the court found Mother maintained regular visitation with the children, but concluded termination of parental rights would not be detrimental to the children because maintaining the relationship did not outweigh the security and stability the children would receive through adoption. The court found by clear and convincing evidence that the children were adoptable, selected adoption as the permanent plan in the children's best interests, and designated the paternal grandparents as the prospective adoptive parents.

## DISCUSSION

Mother describes the issue on appeal as follows: "Continuances are granted upon a showing of good cause. Here, information before the court indicated the children might suffer detriment if [Mother]'s parental rights were terminated. The court erred by failing to grant [Mother]'s request to continue the selection and implementation hearing so she could obtain a

15

previously ordered bonding study that would have answered the detriment question."

We disagree with Mother's characterization of the proceedings—that her counsel requested the juvenile court continue the section 366.26 hearing for preparation of a bonding study, and the court denied counsel's request. As set forth above, when the section 366.26 hearing commenced on October 28, 2022, Mother's counsel did not mention the bonding study or request a continuance of the hearing for preparation of a bonding study. Rather, counsel indicated Mother was prepared to proceed with the section 366.26 hearing that day and to call her witness to testify. The court ordered Mother's witness to re-appear at a continued section 366.26 hearing on November 17, 2022. There was no mention of the bonding study by anyone at the section 366.26 hearing on October 28, 2022.

At the continued section 366.26 hearing on November 17, 2022, the court, without prompting by any party, inquired about the bonding study the court had ordered on August 11, 2022, at Mother's request. Mother's counsel explained that over a period of three months he had not found an evaluator to prepare a bonding study and, although Mother would like to have the court appoint another evaluator, he was unaware of anyone who could conduct an evaluation and prepare a bonding study. The court asked Mother's counsel, "what do you want to do," and he responded: "I know that we have sought to do the bonding study. We have not been able to get anybody to do it. If the court continues the hearing for that purpose, I will try to find another evaluator to do the bonding study with Mother." The court asked Mother's counsel if he was prepared to proceed with the section 366.26 hearing. He answered affirmatively and stated he was

16

"ready" to call Mother's witness to testify. He did not mention the bonding study again.

As DCFS pointed out in its respondent's brief, a "party on appeal cannot successfully complain because the trial court failed to do something which it was not asked to do . . . ." (*In re Cheryl E.* (1984) 161 Cal.App.3d 587, 603.) "As a general rule, a party is precluded from urging on appeal any point not raised in the trial court. Any other rule would permit a party to play fast and loose with the administration of justice by deliberately standing by without making an objection of which he is aware. . . . He who consents to an act is not wronged by it." (*In re Richard K.* (1994) 25 Cal.App.4th 580, 590.)

As the foregoing summary of the proceedings shows, Mother's counsel did not ask the juvenile court to continue the section 366.26 hearing. Rather, counsel indicated that *if the court decided to continue the hearing* for preparation of a bonding study (as it was the court that raised the issue of the bonding study at the section 366.26 hearing in the first place), then counsel would try to find an evaluator to conduct the study, but he was not confident he would succeed in doing so. Counsel never asserted that a continuance of the section 366.26 hearing for preparation of a bonding study was necessary for Mother to make her case on the parental-benefit exception to termination of parental rights. Rather, Mother's counsel made clear that Mother was prepared to proceed with the section 366.26 hearing without a bonding study and Mother raised no objection to doing so. "[I]t would be unfair to allow counsel to lull the trial court and opposing counsel into believing" Mother consented to proceeding with the section 366.26 hearing without a bonding study, "and thereafter to take advantage of an error on appeal

17

although it could have been corrected at trial" if Mother had made clear that she objected to proceeding with the hearing. (See *In re Marriage of Arceneaux* (1990) 51 Cal.3d 1130, 1138.)

Even assuming Mother had actually requested a continuance of the section 366.26 hearing and had preserved her contention for appellate review, she could not demonstrate the juvenile court erred in deciding not to further delay the section 366.26 permanency planning hearing for preparation of a bonding study. "We review the juvenile court's decision to deny a continuance for abuse of discretion. [Citation.] 'Discretion is abused when a decision is arbitrary, capricious or patently absurd and results in a manifest miscarriage of justice.' " (*In re D.Y.* (2018) 26 Cal.App.5th 1044, 1056.)

"Although as a general matter continuances are discouraged in dependency cases, they may be granted upon a showing of good cause." (*In re D.Y.*, *supra*, 26 Cal.App.5th at p. 1056; § 352, subd. (a).) Here, Mother presented no good cause to further delay the section 366.26 hearing when all parties (including Mother) stated they were ready to proceed. As already discussed, Mother had had three months to obtain the bonding study. At the continued November 17, 2022 section 366.26 hearing, Mother's counsel informed the juvenile court he had no prospects for obtaining a bonding study, let alone obtaining one in short order. He did not ask the court or DCFS for assistance in finding an evaluator. Further, although counsel informed the court that Mother *wanted* a bonding study, he never explained to the court how a bonding study would be helpful in this particular case, such that the court should further delay permanence for the children so that Mother could *try* to obtain a bonding study. Under these circumstances, Mother did not show good cause for a

18

continuance, and the court's decision to proceed with the hearing without a bonding study was not arbitrary, capricious, or patently absurd.

Mother argues the court's August 11, 2022 order granting Mother's request for a bonding study constituted "an implied finding that the bonding study was required for the section 366.26 hearing," and therefore, proceeding without it was error. In support of this argument, Mother relies on *In re S.R.* (2009) 173 Cal.App.4th 864 (*S.R.*). She acknowledges the case is "not directly on point," but argues it is "instructive." The case is readily distinguishable, both procedurally and substantively.

There, three children, "all six years of age or younger," were removed from the custody of their parents.[6] After the parents failed to reunify, they asked the court to order a bonding study. (*S.R., supra*, 173 Cal.App.4th at p. 867.) The children's "counsel took no position on the issue. Counsel for DHHS [the agency] stated a bonding assessment would provide useful information and did not object to the request. The court agreed and ordered the assessment." (*Ibid*.) Around two months later, the agency filed a section 388 petition to modify the order for a bonding study, explaining it had not found a qualified Spanish-speaking evaluator in the area to conduct an evaluation for the Spanish-speaking parents. The parents opposed the petition, arguing the agency did not establish the requisite elements for modification of an order under section 388: changed circumstances and that the modification would be in the children's best interest. The court granted the petition, allowed

___

[6] The ages of the two younger children were not specified in the *S.R.* opinion.

19

the section 366.26 hearing to proceed without a bonding study, and terminated parental rights. (*S.R.*, at pp. 867-869.)

The Court of Appeal reversed the orders granting the petition for modification and terminating parental rights. The appellate court concluded the agency did not show changed circumstances to modify the order based on the "hollow evidence" of the agency's "meager efforts" to find a qualified Spanish-speaking evaluator. (*S.R.*, *supra*, 173 Cal.App.4th at pp. 870-871.) Moreover, the Court of Appeal concluded the agency did not show modification of the order for a bonding study promoted the interests of the children. (*Id*. at p. 871.) The appellate court emphasized that the parents' request for a bonding study "was not opposed because [the agency] also thought it might be useful. The court agreed and ordered the study." (*Id*. at pp. 869-870.) The Court of Appeal added: "While a bonding study is not statutorily mandated in a dependency proceeding, once ordered, the court has necessarily found it is required by the court or a party. In such a circumstance, the court is without discretion to modify or, more correctly, vacate the order, without substantial evidence on the record that the bonding study is no longer necessary or appropriate for legitimate reasons other than apparent difficulty by [the agency] in complying with the order. The only evidence adduced in this case establishes that inadequate effort by [the agency] led to the failure to complete the court-ordered bonding study. Thus, there is no basis for the court to conclude that the minors' interests are served by vacating the court's order." (*Id*. at p. 871.)

*S.R.* is not instructive here. First, we are not reviewing an order granting a section 388 petition and evaluating the elements of such a petition. Second, *S.R.* is not factually similar

20

to this case. There, three children were removed from parental custody when the oldest was six years old. A year and a half later, when the parents requested a bonding study, the agency and the court agreed with the parents that a bonding study would be useful under the circumstances of the case. Here, all three children were detained from Mother within a few months of birth, and they did not live with Mother thereafter. Mother requested a bonding study when the children ranged in age from nearly two to nearly four years old. DCFS and the children's counsel opposed Mother's request for a bonding study. The juvenile court expressly stated it did not believe a bonding study would be helpful to the court given the very young ages of the children.[7] The court nonetheless granted Mother's request for a bonding study. Three months later, Mother had not obtained the bonding study she requested, and her counsel indicated he was unsure whether Mother could obtain a bonding study at that time. Mother's counsel consented to proceeding with the section 366.26 hearing without a bonding study, did not object to doing so, and never argued to the juvenile court that a bonding study was necessary for her to make her case on the parental-benefit exception to termination of parental rights. On appeal, Mother does not argue her counsel's efforts to obtain a bonding study were lacking (in fact, she describes his effort as "significant") or

---

[7] Mother does not cite a case indicating a bonding study is warranted under circumstances similar to those in the matter before us—where children were detained from a parent shortly after birth, and parental rights were terminated when the children were four years of age and younger, after a period of monitored visitation.

represent that she could have obtained a bonding study in a timely manner if the juvenile court had continued the hearing.

For all the foregoing reasons, the juvenile court did not err in proceeding with the section 366.26 hearing without the bonding study.

## DISPOSITION

The order is affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

ROTHSCHILD, P. J.

BENDIX, J.

22