Filed 9/4/24  In re B.A. CA2/4

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re B.A., a Person Coming Under the Juvenile Court Law. | B326317<br><br>(Los Angeles County Super. Ct. Nos. 22CCJP01618 22CCJP01618A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>  Plaintiff and Respondent,<br><br>    v.<br><br>CARLOS A.,<br><br>Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Cathy Ostiller, Judge, Ashley Price, Judge Pro Tem.  Affirmed.

The Law Offices of Breana Frankel and Breana Frankel; and Deborah Dentler, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent.

Marsha F. Levine, under appointment by the Court of Appeal, for Respondent N.R.

Ernesto Paz Rey, under appointment by the Court of Appeal, for minor B.A.

Appellant Carlos A. (father) appeals from a juvenile court order terminating dependency jurisdiction over his daughter, B.A., and issuing an exit order awarding sole physical and legal custody to B.A.'s mother, respondent N.R. (mother). We affirm the order. Father's counsel specifically requested that mother receive sole physical custody, and the court did not abuse its discretion by awarding mother sole legal custody in light of the unaddressed domestic violence issues in the case.

## BACKGROUND

### I. Previous Incident

The family came to the attention of the Los Angeles County Department of Children and Family Services (DCFS) in October 2021, after a domestic violence incident. According to everyone interviewed about the incident, including father and mother, mother screamed at father and parents pushed one another before father left the home with B.A. According to the DCFS summary of the incident, "During the course of the investigation CSW [children's social worker] became aware that the parents had previously ended their relationship and was [*sic*] having

2

difficulties co-parenting. . . . Per the family when the parents were in a relationship they argued often not [*sic*] resulting in a physical altercation. CSW educated the parents of any future referral being generated and the possible outcomes which might not be in their favor should there be any more physical altercations. Both parents report they understood and reported now that they are both in agreement of how they will provide and share responsibility and that they don't foresee any issues." The referral was closed as inconclusive.

## II.    Current Incident and Investigation

Less than six months later, on March 2, 2022, DCFS received a referral alleging that father and mother engaged in a violent physical altercation in front of B.A., who was then nearly three. Father, mother, and B.A. were living together in the home of father's brother (paternal uncle) even though father and mother were no longer romantically involved. Both parents were drinking before the incident. Mother told the responding CSW the incident began when father questioned her about receiving a ride home from a male coworker. Mother reported she became frustrated with father's questioning and threatened to call his pregnant girlfriend, A.M., to tell A.M. that mother and father were sleeping together. Father tried to take mother's phone and began choking her; she bit him. Father then hit mother in the face five to 10 times with a closed fist. The incident ended when paternal uncle opened the door to the room in which parents were fighting and called 911.

According to the police report, paternal uncle stated that he kicked open the door to a bedroom when he heard arguing and screaming coming from inside. Paternal uncle told father to leave and waited with mother to translate for her while she spoke

3

to the police. Mother's statement to police tracks the account she gave the CSW. According to the police report, mother "had bruising and swelling of her right eye, swelling and deformity to the right side of her face and her lower left jaw, a cut on her bottom lip, and redness on her neck." She refused ambulance transport to the hospital but did request and receive a temporary restraining order.

Police apprehended father outside the home. They observed "a red mark on his left wrist consistent with a bite mark," and mother identified him as the perpetrator of her injuries. Father denied involvement in any physical altercation and told police "he did not know anything about the incident nor where [mother] was at the time of the incident." He admitted drinking three or four beers earlier in the evening and said he "may have fallen earlier." Police arrested father and transported him to jail.

Mother told the CSW that she was unable to eat solid foods for three days due to "the overwhelming trauma" she sustained; she also had to go to the hospital the day after the incident for an injection to ease her pain. The CSW noted that mother was "very emotional," "still healing," and "having difficulty talking" nearly two weeks after the incident. During DCFS's visit, B.A. appeared developmentally on target and played with the CSW. B.A. did not have any marks or bruises on her body.

Mother told the CSW that she wanted DCFS to help her transition to a new life with B.A., apart from father. She was "visibly distraught" and refused to return to the area around paternal uncle's home for any reason. She and B.A. were living at a domestic violence shelter, where mother was participating in parenting classes and individual counseling. Mother's case

4

manager there reported that mother was appropriate with B.A. and there were no concerns.

The CSW later spoke with father in the jail. He stated he and mother were no longer in a relationship and he was expecting a child with his current girlfriend, A.M. He had been living at paternal uncle's house with mother because he "had nowhere to go" after being released from jail in late January 2022; he admitted a history of driving under the influence. He was convicted of willful infliction of corporal injury (Pen. Code, § 273.5) in connection with the current incident in mid-April 2022, and the criminal court issued a 10-year restraining order protecting mother from him at that time.

Father reported that he and mother previously engaged in physical altercations, but mother "is always the one who hits me." Regarding the current incident, father stated that he and mother had been drinking beer with neighbors. Father came home first and tried to take a nap in the living room. When mother came home, she woke up father, led him to the bedroom, and tried to take off his clothes. Father resisted, because he was in a relationship with A.M. Mother then "pushed father to try to overpower him." Mother started choking father, and he accidentally hit her in the face and "busted her lip" with his ring while trying to protect himself. Father also told the CSW that he and mother had argued about mother leaving B.A. "in one of her boyfriend's cars while she went into the home to get her boyfriend lunch." Father did not tell the police any of this at the time of the incident because he feared they would take B.A. from him. Father had not communicated with mother and B.A. since the incident, but told the CSW "he would like to keep his daughter."

5

Paternal uncle told the CSW that father came to the United States from Honduras three years ago, and mother followed with B.A. when B.A was about one year old.  Paternal uncle immediately noticed problems between mother and father, whom he described as "toxic together."  Paternal uncle told father to move out after the domestic violence incident in 2021 but "after that, mother did not want to let the father see the child."  Father moved back into the home after his release from jail in January 2022 because he was unable to live with A.M. Paternal uncle stated that "both the parents were aggressive and physical towards each other," and he "believes mother may have planned this incident however [*sic*] he does not justify father's actions."

## III.   Dependency Petition and Initial Hearing

On April 27, 2022, DCFS filed a dependency petition on behalf of B.A. under Welfare and Institutions Code section 300.[1] It alleged the following identical counts under section 300, subdivisions (a) and (b): "The child, [B.A.]'s mother . . . and father . . . have a history of engaging in violent altercations in the child's presence.  On 3/2/2022, the father grabbed the mother by mother's neck, choked the mother and repeatedly struck the mother's face with the father's fists, in the presence of the child, inflicting bruising to the mother's eye, swelling and deformity to the mother's face, redness to the mother's neck, and a laceration to the mother's lip.  The mother bit the father's arm, inflicting a red mark to the father's left arm. The mother grabbed the father's testicles.  On a prior occasion, the mother choked the father.  On prior occasions, the mother and father engaged in physical altercations. On 4/18/2022, the

---

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

6

father was convicted of PC 273.5(a) Inflict Corporal Injury upon Spouse/Cohab. Such violent conduct on the part of the father and the mother endangers the child's physical health and safety, creates a detrimental home environment and places the child at risk of serious physical harm damage [*sic*] and danger." The petition also alleged that B.A. was at risk within the meaning of section 300, subdivision (b) due to father's current abuse of alcohol and marijuana and mother's failure to protect her from it. DCFS detained B.A. from father, but she remained in mother's care.

In advance of the initial hearing, mother filed a request for a domestic violence restraining order protecting herself and B.A. from father. At the initial hearing on May 11, 2022, the court found a prima facie case for jurisdiction over B.A. It detained B.A. from father, who was still in custody, and ordered monitored visitation for him. The court ordered B.A. to remain in mother's care, and issued a temporary restraining order protecting mother and B.A. from father. It set the adjudication and restraining order hearings for June 10, 2022.

IV. **Jurisdiction/Disposition Report**

DCFS filed a jurisdiction/disposition report on June 2, 2022. It reported that B.A. "appeared to be close [*sic*] bonded with the mother," who had no concerns about B.A.'s well-being or development. Mother told DCFS that she had a picture of B.A. with father, and B.A. "saw it and did not want to let it go. [B.A.] said that she want [*sic*] to see him." It appears that B.A. had not seen father; the only visitation documented in the report is a 15-minute phone visit on May 23, 2022. Mother was not present during the visit, which a CSW monitored. Mother said she did

7

not "want [father] to have any visits." She added, "I don't want him to know anything about us. I want him out of our lives."

A dependency investigator (DI) interviewed mother about the allegations.[2] Mother told the DI that on the day of the incident, she and father had been drinking with the neighbors. Mother returned home around 9:00 p.m. to watch a movie with B.A. Father came home around midnight, entered the room, and took off his clothes. He then began questioning mother about her coworker. Mother responded that the coworker had just given her a ride and asked father why he was asking, since he and mother were no longer in a relationship. Father became upset and told mother she had been texting his girlfriend and to "stop bothering" her. Mother said she would text her if she wanted to. Mother grabbed her phone, and father "jumped on top of [her] and said no" and "grabbed" her neck. Mother told father to leave and began to have difficulty breathing. Father said, "I will kill you," but released mother after she bit his hand. Parents fell to the floor, which woke B.A., who started yelling for mother. Father continued trying to grab mother's neck; she responded by "grabbing his balls." Mother then ran for the door, but father grabbed her hair, pushed her to the floor, and started punching her in the face. Father continued striking mother until paternal uncle knocked down the door.

Mother reported that father had consumed five beers that day and was drunk at the time of the incident. When asked about the substance abuse allegation, she reported that father "drinks a lot." Mother stated that she does not drink, though she

---

2       For reasons unclear from the record, the DI did not interview father. The parties agreed to continue the adjudication hearing so father could be interviewed.

also said she had one beer on the day of the incident. The DI noted that DCFS "will continue to assess mother's potential alcohol use despite her denying excessive use," given the circumstances of the incident.

DCFS recommended that the juvenile court sustain all allegations in the petition and declare B.A. a dependent. It recommended that B.A. stay in mother's care, and that mother receive family maintenance services including parenting classes, domestic violence victims' classes, and individual counseling. DCFS further recommended that father continue to receive monitored visitation, monitored by someone other than mother, and "enhancement services"[3] including parenting and anger management classes, domestic violence perpetrators' classes, individual counseling, and on-demand drug and alcohol testing.

## V. Continuance and Supplemental Report

On June 10, 2022, the court continued the adjudication hearing so DCFS could interview father. It held the restraining order hearing as scheduled, however, and issued a three-year permanent restraining order protecting mother and B.A. from father with a "carve out for visitation."

On July 7, 2022, DCFS filed a supplemental report. It documented a June 26, 2022 interview with father, who told the DI that on the day of the incident, he was working on a car outside and saw mother leave the house with B.A. around 3:00

---

[3] Enhancement services are offered to a parent not retaining custody and are designed to enhance the child's relationship with that parent by requiring the parent to address the issues underlying jurisdiction. Enhancement services are not designed to reunify the child and parent. (*In re Destiny D.* (2017) 15 Cal.App.5th 197, 212-213.)

p.m.  Mother and B.A. returned around 4:00 or 5:00 p.m. "in a man's car."  Mother left B.A. in the car while she went into the house.  Father "did not like that" because B.A. "is a little girl and you can't leave her alone with a man I don't know."  At around 8:00 p.m., father finished working on the car and went to the neighbors' house to drink.  He returned home around 9:00 p.m., while mother stayed later. Father tried to sleep in the living room, but when mother got home she grabbed his hand and told him to go to the bedroom because she wanted to have sex.  Father said no and reminded mother he had a girlfriend.  Mother then said she would text his girlfriend.  Father told mother to leave his girlfriend alone and grabbed mother's phone.  Mother then began hitting father.  She grabbed him by the neck and pushed him to the floor.  When he tried to push her away, she bit his arm.  Father then "backhanded" mother, but "did not measure [his] swing" because he was drunk and "ripped her lip open."  Paternal uncle broke down the door, and mother blamed father for the incident.  Paternal uncle kicked father out of the home.  Father stated that on previous occasions mother had hit and slapped him, and "tried to cut me with a knife while I had the baby."

When asked about his substance use, father denied using drugs.  He said he drank about 12 beers "from Friday to Saturday."  Father denied having a drinking problem, explaining, "If there is beer I would drink but if not I would not.  Also, if I have to do things or care for my daughter I would not drink."

Father stated that he and B.A. loved one another.  When he called her on the phone, she said she missed him.  Father enjoyed playing with and caring for B.A., and he fed her and paid for childcare.  He told the DI, "I would do the classes but I want my daughter back when I am done."

10

DCFS reiterated its previous recommendations.

## VI.   Adjudication

The court held a combined jurisdiction and disposition hearing on July 13, 2022. After reviewing the evidence and hearing argument from counsel, the court concluded that "mother's statements are more credible than father's rendition of what happened. When first interviewed by law enforcement, father claimed not to know anything about the incident or not remember anything about the incident. It was unclear to me. However, mother had significant facial injuries such that she was unable to eat solid food for three days after the incident. That is more consistent with repeated blows to the face which is what mother indicated happened." The court further found that the violence was not mutual, and mother had been defending herself. The court accordingly ordered the language referring to mother stricken from both counts relating to the incident. It sustained both domestic violence allegations as modified, finding that "it's sufficient for an (a) count" because "B.A. was on the same bed that the parents were on when the fighting began." The court found a "lack of nexus" between father's "excessive" drinking and any risk to B.A., however, so it dismissed the allegation related to substance abuse and said it would "address those issues in disposition."

At disposition, the court declared B.A. a dependent and removed her from father, citing "the level of violence in this domestic violence incident right next to the child. The child was calling out for her mother during the incident. It was clearly very traumatizing to the child, and the court believes that father has some unresolved issues he needs to work on in his case plan." The court ordered father to complete a 52-week domestic violence

11

program, parenting classes, anger management classes, individual counseling, and on-demand or random drug and alcohol testing. The court ordered monitored telephonic visitation "until father is released from custody" and gave DCFS discretion to liberalize. The court ordered mother to participate in individual counseling, complete a program for victims of domestic violence, and comply with the terms of the protective order issued by the criminal court. The court set the matter for a section 364 six-month review hearing on January 11, 2023.

## VII. Status Review Report

DCFS filed a status review report on December 23, 2022, in advance of the six-month review hearing. DCFS reported that B.A. remained placed with mother, who had cooperated with DCFS throughout the proceedings. It described B.A. as "a loving, curious, and happy toddler" who was "easy going and can be soothed or self-sooth when upset." B.A. "appear[ed] to be well-bonded to both mother and father."

DCFS reported that mother had provided B.A. with a safe and healthy home environment and met all B.A.'s needs. It further stated that mother "has demonstrated she has acquired the necessary skills to foster healthy relationships and continue providing safety and permanency for her daughter." At a child and family team meeting involving mother and B.A., mother stated that her goals were to provide B.A. with a safe and loving home and for DCFS to close the case.

DCFS reported that father had "shown progress in completing his court ordered services." He enrolled in an 18-month "treatment program" at The High Road in July 2022, and was scheduled to complete it in January 2024. His counselors there reported that he was in compliance with the programming,

and had attended 10 individual and nine group counseling sessions and one parenting class. Father's enrollment letter and contract for The High Road, both in Spanish, were attached to the report. Father tested negative for substances three times but missed his scheduled tests four times; he told the DI that his employer's attendance policies and his involvement in other court-ordered services made it difficult for him to test consistently.

Father had four in-person and seven virtual visits with B.A. The CSW who monitored the visits noted that B.A. was "happy and comfortable in the presence of her father," and father was "engaged during play and activities" with her. Father brought toys, clothing, and food to the visits, and redirected B.A. appropriately. At a child and family team meeting involving father and B.A., father stated his goal was "to continue having a relationship with his daughter . . . and see her on a frequent and consistent basis." Father also stated that he was "committed to complete all is [*sic*] court ordered programs" and wanted to be a better father and role model to B.A.

DCFS recommended that jurisdiction be terminated with a family law or exit order granting parents joint legal custody of B.A. and mother sole physical custody, with monitored visits for father.

## VIII. Termination of Jurisdiction and Exit Order

The court held the six-month review hearing on January 11, 2023. At the outset, the court noted DCFS's recommendation and asked counsel for their arguments.

Counsel for B.A. argued that mother should receive both sole legal and physical custody. She noted that the status review report had not mentioned father participating in or completing a

domestic violence program, and asserted that was "prima facie evidence that the causes for jurisdiction still exist." She continued, "I don't know how these parents can co-parent if father hasn't done anything to address the underlying issues of DV. . . . DV is the physical manifestation of issues of power and control. There is a restraining order. I don't believe that co-parenting can be effectively done as long as the father – I don't see any evidence that he has addressed the underlying DV issue." Minor's counsel further asserted that an order of joint legal custody "would preclude special immigrant juvenile findings"[4] for B.A., and thus would "compromise her ability to obtain legal documentation in the United States." Mother's counsel joined these arguments. She added that mother "is very uncomfortable

---

[4]     Special immigrant juvenile (SIJ) status is a federal immigration status created "to protect certain immigrant children and allow them to remain in the United States when it would not be in their best interests to be returned to their home countries." (*Guardianship of Saul H.* (2022) 13 Cal.5th 827, 837.) A child may apply for SIJ status if "(1) the child is a dependent of a juvenile court, in the custody of a state agency by court order, or in the custody of an individual or entity appointed by the court; (2) it would not be viable to reunify the child with one or both parents because of 'abuse, neglect, abandonment, or a similar basis found under State law'; and (3) 'it would not be in the [child's] best interest to be returned to the [child's] or parent's previous country of nationality or country of last habitual residence.'" (*Id.* at pp. 837-838.) "Each of these predicate findings must be made in state court proceedings. [Citation.] A state court order containing these findings is a required component of an immigrant child's application to the United States Citizenship and Immigration Services for special immigrant juvenile status, which allows the child to seek lawful permanent residence in the United States." (*Id.* at p. 838.)

14

with having to go through co-parenting with a restraining order in place and not having a relationship with the father," and asserted that "having to go through the father to make any decisions" about B.A. would "put so much pressure" on mother.

Father's counsel asked the court "to follow the recommendation of joint legal and sole physical to mom." She emphasized that father was "engaged in some programs," having consistent "quality visits" with B.A., and testing clean. She reiterated, "I am asking the court to follow the recommendations." Counsel for DCFS stated, "I also noted that father had not done any domestic violence courses, so I was going to ask for monitored visits but mother not to monitor. Because I don't think those issues have been addressed by father through services yet, but I would otherwise submit."

The court stated that it was "persuaded by [B.A.'s counsel's] arguments. . . . [G]iven the circumstances, I do think it makes sense for mother to have sole legal and sole physical custody of the child, so I am prepared to terminate jurisdiction with [an exit order] that provides for that." The court terminated jurisdiction over B.A., an order it stayed pending receipt of a family court order giving mother sole legal and physical custody of B.A. with monitored visits to father. At the request of B.A.'s counsel, who represented that she planned to seek SIJ status findings in the future, the juvenile court also referred B.A. to the "special immigration juvenile status unit" while the exit order was pending.

Father timely appealed.

## DISCUSSION

Father contends the court erred by awarding mother sole physical and legal custody of B.A. He argues the order was

15

unsupported by substantial evidence and the court's consideration of SIJ status was improper.

## I. Legal Standards

When "the juvenile court terminates its jurisdiction over a minor who has been adjudged a dependent child of the juvenile court . . . the juvenile court on its own motion, may issue . . . an order determining the custody of, or visitation with, the child." (§ 362.4, subd. (a).) "When making a custody determination in any dependency case, the court's focus and primary consideration must always be the best interests of the child." (*In re Nicholas H.* (2003) 112 Cal.App.4th 251, 268.) The juvenile court also "'has a special responsibility to the child as *parens patriae* and must look at the totality of the child's circumstances'" when considering his or her best interests. (*In re Chantal S.* (1996) 13 Cal.4th 196, 206.) The juvenile court therefore is not bound by presumptions regarding joint custody enshrined in the Family Code. (*Ibid.*; see also *In re C.M.* (2019) 38 Cal.App.5th 101, 108-109; *In re Jennifer R.* (1993) 14 Cal.App.4th 704, 711-712.)

"[T]he juvenile court has broad discretion to make custody orders when it terminates jurisdiction in a dependency case." (*In re Nicholas H., supra,* 112 Cal.App.4th at p. 265, fn. 4.) We do not disturb the court's decision unless it is arbitrary, capricious, or patently absurd. (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*Id.* at pp. 318-319.) Thus, "[i]n most cases, the juvenile court will not abuse its discretion if substantial evidence supports its underlying factual findings."

16

(*In re D.R.* (2010) 185 Cal.App.4th 852, 863 [discussing abuse of discretion standard in context of motion to terminate de facto parent status].)

II.    **Analysis**

A.    **Physical Custody**

Respondents DCFS and mother assert that father has forfeited any argument regarding sole physical custody because his counsel below specifically asked the court to follow DCFS's recommendation of awarding mother sole physical custody. Respondent B.A. joins the argument.  In his reply brief, father "assum[es] *arguendo* that [he] may have forfeited his challenge to the order of sole physical custody to mother by acquiescing to that order at the hearing."  We agree.

A parent's submission on a DCFS recommendation "dispels any challenge to and, in essence, endorses the court's issuance of the recommended findings and orders." (*In re Richard K.* (1994) 25 Cal.App.4th 580, 589.)  "If, as occurred in this case, the court in turn makes the recommended orders, the party who submits on the recommendation should not be heard to complain." (*Id.* at pp. 589-590.)  Here, father's counsel asked the juvenile court *twice* "to follow the recommendation of joint legal and sole physical to mom."  Father accordingly cannot challenge the award of sole physical custody to mother.

B.    **Legal Custody**

Father argues that the juvenile court should have awarded joint legal custody because "evidence in the record demonstrated that [he] was complying with the court ordered case plan, admitted responsibility for his actions, and was committed to having a continuing relationship with his daughter."  He further argues that any evidence to the contrary was insufficient to

17

"justify" the grant of sole legal custody to mother, and asserts that the court "improperly penalized [him] for his alleged lack of participation in a single aspect of the case plan" rather than placing B.A.'s best interests at the fore. We are not persuaded the court abused its discretion.

The juvenile court credited mother's statements about the incident. That is, it found that father brutally attacked mother in front of B.A. because she questioned him and possibly communicated with his girlfriend, causing "deformity" to her face so extensive she was unable to eat solid food for three days and appeared distraught and injured two weeks later. The record is also replete with other evidence of parents' inability to get along. Paternal uncle characterized parents' relationship as "toxic," their difficulties co-parenting B.A. dated at least to the previous 2021 incident, and mother was so fearful of father that she refused to return to the area around paternal uncle's home and sought a second restraining order to protect both herself and B.A. Contrary to father's claim, there is no evidence in the record suggesting father took responsibility for his role in the incident or broader problems in parents' relationship. Instead, he initially denied knowledge of and involvement in the incident and later maintained that he "accidentally" hit mother a single time, "busting" her lip with his ring.

The juvenile court reasonably could conclude from this evidence that joint legal custody, which would require parents to effectively communicate about important matters involving B.A., was not in B.A.'s best interests. Even if the juvenile court credited father's statement about the genesis of the 2022 incident—he questioned mother because she briefly left B.A. in the car with someone she trusted, in full view of father—parents'

18

inability to resolve this minor issue amicably does not bode well for their ability to collectively make more substantial decisions concerning B.A.'s medical, educational, and other needs.

Father's compliance with some aspects of his case plan does not render the court's ruling an abuse of discretion.[5] During the six-month review period, father attended one parenting class and a total of 19 individual and group counseling sessions. He did not enroll in or attend any programming addressing domestic violence, the sole basis for the court's exercise of jurisdiction over B.A. Father asserts that DCFS "never addressed [his] purported failure to attend domestic violence classes with either appellant or the juvenile court." Yet the record indicates that DCFS provided father "with referrals as needed and requested," and father's counsel did not challenge the accuracy of this representation or introduce evidence showing father's enrollment in domestic violence programming or impediments thereto. This case is not like *Amanda H. v. Superior Court* (2008) 166 Cal.App.4th 1340, 1347, a termination of rights case in which the social worker "incorrectly informed mother that she had enrolled in all the court-ordered programs and then, at the 12-month mark, told her that she actually was not enrolled in all of the required programs" and "used this lack of enrollment as a basis to recommend that services be terminated." There is no evidence of a similar bait-and-switch here, nor is there evidence that the court awarded mother sole legal custody to "punish one parent

---

[5] Notably, father acknowledges that his "failure to complete his case plan in the very short period of time he was provided may support the juvenile court's order with respect to physical custody."

19

. . . for failing to comply with the case plan." (*In re N.M.* (2023) 88 Cal.App.5th 1090, 1095.)

It is a parent's "responsibility to attend the programs and address her [or his] problems" (*Amanda H. v. Superior Court*, *supra*, 166 Cal.App.4th at p. 1347), and father did not appear to acknowledge or undertake efforts to remedy his problems with domestic violence here. His consistent visitation with B.A. and dedication to a positive relationship with her do not demonstrate an ability to engage in productive co-parenting, which was a basis for the court's order here. Father asserts that parents in other cases in which awards of sole legal custody were affirmed, *In re Jennifer R.*, *supra*, 14 Cal.App.4th 704, and *In re Maya L.* (2014) 232 Cal.App.4th 81, had "significant" problems and generally engaged in worse behavior than he did. The juvenile court is tasked with making orders that serve the best interests of each unique child before it, not comparing a parent's efforts or struggles to those in other cases to determine whether joint custody is "justified" in the abstract. The juvenile court clearly did that here, notwithstanding its failure to use the specific phrase "best interests." "[W]e will infer a necessary finding provided the implicit finding is supported by substantial evidence." (*In re S.G.* (2003) 112 Cal.App.4th 1254, 1260.) The juvenile court is not required to provide a specific statement of reasons when making a custody order. (*In re Jennifer R.*, *supra*, 14 Cal.App.4th at pp. 713-714.) "The court's order was sufficient to generally show the basis for its ruling," and father has not shown prejudice "since the record is clear as to the circumstances leading to the denial of joint legal custody." (*Id.* at p. 714.) Should those circumstances change in the future, father may seek joint legal custody in the family law court. (See *ibid.*)

Father finally contends that the juvenile court erred to the extent it considered B.A.'s eligibility for SIJ status when making the custody determination. However, the case law father relies upon is not on point. In *Leslie H. v. Superior Court* (2014) 224 Cal.App.4th 340, the issue was whether the court erred in denying a child's request to make the necessary factual findings to enable her to apply for SIJ status because she previously had been committed to juvenile hall. Father accurately quotes the appellate court's admonishment that the trial court's "role in the SIJ process is not to determine worthy candidates for citizenship, but simply to identify abused, neglected, or abandoned alien children under its jurisdiction who cannot reunify with a parent or be safely returned in their best interests to their home country." (*Id.* at p. 351.) Yet this admonishment refers to the court's refusal to make specific factual findings requested in a petition and supported by the evidence, not a decision regarding custody or even dependency jurisdiction. Similarly, *Bianka M. v. Superior Court* (2018) 5 Cal.5th 1004, 1011 concerns a court's improper refusal to make requested findings because it concluded the petitioning child had "immigration-related motivations for filing the action." A court is statutorily required to make requested findings when they are supported by the evidence, regardless of the "asserted, purported, or perceived motivation of the child" making the request. (Code Civ. Proc, § 155, subd. (b)(2).) Here, B.A. had not filed a petition seeking SIJ status, nor was the court asked to make findings pertinent to any such petition. Father has not demonstrated an abuse of the trial court's discretion.

# DISPOSITION

The order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


COLLINS, ACTING P. J.

We concur:


MORI, J.


ZUKIN, J.